Steve W. Berman (*pro hac vice*)
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
T: (206) 623-7292
F: (206) 623-0594

Christopher R. Pitoun (SBN 290235)
*christopherp@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
T: (213) 330-7150
F: (213) 330-7152

*[Additional Counsel Listed on Signature Page]*

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NATHANIEL BOOKER, NINA TEPIRDZHYAN, JUSTIN FOUST, JAY PATEL, ELIZABETH LAWRENCE STAPLES, and MOHAMMED KARIMZADA, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br> v.<br><br>AMERICAN HONDA MOTOR CO., INC., a California Corporation,<br><br>       Defendant. | No. 2:20-cv-05166-SVW-AS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   PARTIES ............................................................................................ 5

    A.    Plaintiffs ................................................................................... 5

        1.    Plaintiff Nathaniel Booker ............................................ 6

        2.    Plaintiff Nina Tepirdzhyan .......................................... 7

        3.    Plaintiff Justin Foust ................................................... 8

        4.    Plaintiff Jay Patel ........................................................ 10

        5.    Plaintiff Elizabeth Lawrence Staples ......................... 11

        6.    Plaintiff Mohammed Karimzada ................................. 12

    B.    Defendant ................................................................................ 13

III.  JURISDICTION ................................................................................ 20

IV.   VENUE .............................................................................................. 20

V.    FACTUAL ALLEGATIONS ............................................................. 21

    A.    Honda's History of Defective Fuel Delivery Systems ............ 21

    B.    Honda Has Not Remedied the Fuel Pump Defect in Affected Vehicles .................................................................... 23

    C.    NHTSA Complaints Reveal That the Fuel Pump Defect Poses Serious Safety Risks ...................................................... 24

    D.    Honda Sells, Markets, and Advertises Honda and Lexus Brand Vehicles as Safe and Reliable ........................................ 40

    E.    Plaintiffs and Class Members Would Not Have Purchased or Leased, or Would Have Paid Less for, Affected Vehicles Had They Known of the Fuel Pump Defect ............................. 46

    F.    Honda Has Manipulated Its Warranty to Minimize Its Obligation to Fix the Fuel Pump Defect in Affected Vehicles ............. 46

    G.    Allegations Establishing Agency Relationship Between Manufacturer Honda and Honda Dealerships .......................... 47

- i -

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ..................................... 50

    A.    Discovery Rule Tolling ........................................................... 50

    B.    Fraudulent Concealment Tolling ............................................ 51

    C.    Estoppel .................................................................................. 51

VII.   CHOICE OF LAW ALLEGATIONS ...................................................... 52

VIII.  CLASS ALLEGATIONS ....................................................................... 52

    A.    Claims Brought on Behalf of the Nationwide Class .............. 56

COUNT I  FRAUDULENT CONCEALMENT (BASED ON COMMON LAW) ................................................................................................... 56

COUNT II  BREACH OF CONTRACT (BASED ON COMMON LAW) ............. 59

    B.    Claims Brought on Behalf of the Nationwide Class, or Alternatively on Behalf of a California Subclass .................. 60

COUNT III  VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ.*) ................ 60

COUNT IV  VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ......................................................................................... 64

COUNT V  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE § 2314) ................................... 67

    C.    Claims Brought on Behalf of the Florida Subclass ............... 68

COUNT VI  VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") (FLA. STAT. ANN. § 501.201, *ET SEQ.*) ...................................................... 68

COUNT VII  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (FLA. STAT. ANN. §§ 672.314 AND 680.212) ......................................................................................... 70

COUNT VIII  BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (BASED ON FLORIDA STATE LAW) .......................... 72

COUNT IX UNJUST ENRICHMENT ....................................................... 73

    D.    Claims Brought on Behalf of a Kentucky Subclass ............... 74

COUNT X  VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. ANN. § 367.110 *ET SEQ.*) ............................................................................. 74

    E.    Claims Brought on Behalf of an Indiana Subclass ............................... 75

COUNT XI VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3) ................................ 75

COUNT XII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (IND. CODE § 26-1-2-314) ...................................... 77

COUNT XIII UNJUST ENRICHMENT ................................................................ 79

    F.    Claims Brought on Behalf of a Virginia Subclass ............................... 80

COUNT XIV VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*) .................... 80

COUNT XV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (VA. CODE ANN. § 8.2-314) ................................ 82

    G.    Claims Brought on Behalf of a Pennsylvania Subclass ......................... 84

COUNT XVI VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET SEQ.*) ............................................................................ 84

COUNT XVII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (13 PA. CONS. STAT. ANN. § 2314) ..................... 85

COUNT XVIII UNJUST ENRICHMENT ............................................................. 87

    H.    Claims Brought on Behalf of a New York Subclass ............................ 88

COUNT XIX VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. GEN. BUS. LAW § 349) ................................................ 88

COUNT XX VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. GEN. BUS. LAW § 350) ................................................ 90

COUNT XXI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. § 2-314) ............................................. 91

COUNT XXII UNJUST ENRICHMENT .............................................................. 93

REQUEST FOR RELIEF ..................................................................................... 94

DEMAND FOR JURY TRIAL .............................................................................. 94

- iii -

Plaintiffs Nathaniel Booker, Nina Tepirdzhyan, Justin Foust, Jay Patel, Elizabeth Lawrence Staples, and Mohammed Karimzada, on behalf of themselves and all others similarly situated (the "Class"), allege the following based upon the investigation of counsel and information and belief as noted.

## I.      INTRODUCTION

1.      One of the most significant advancements in the internal combustion engine over the last 30 years has been the widespread adoption of fuel injection systems instead of carburetors to supply fuel to the engine. The fuel injection system uses fuel pumps to efficiently and effectively (when working correctly) manage the flow of fuel from the fuel tank to the engine in order to maintain operability and prevent engine stalling. The fuel delivery system is one of the most basic safety features in every modern car because it controls speed and keeps the engine running unless and until an operator wants to turn the engine off. If the fuel delivery system in a car is defective, then the car is unsafe to operate because it will not predictably respond to operator input to accelerate and it could stall or completely lose power while in motion. American Honda Motor Co., Inc. ("Honda") has sold and marketed the Affected Vehicles defined below with defective low-pressure fuel pumps that cause unpredictable acceleration, sputtering, and engine stalls and render the Affected Vehicles unsafe to operate.

2.      This lawsuit arises because Honda knew that the low-pressure fuel pumps in the Affected Vehicles contained a defect that causes systemic fuel system failures. Yet Honda refuses to repair or replace such defective systems and continues to sell—and require its customers to drive—its vehicles with the defective fuel delivery system, which could result in injuries or even deaths that could otherwise be avoided.

3.      Affected Vehicles include all Honda and Acura models that use the Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefix 17045-. Honda has instituted at least *two* safety recalls in the United States

- 1 -

concerning the defective low-pressure fuel pumps, including one on January 29, 2019, when Honda submitted a recall report (the "2019 Safety Recall Report") to NHTSA voluntarily recalling nearly over 430,000 Honda and Acura vehicles.[1] That recall covered the following vehicles (collectively, the "2019 Recalled Vehicles"):

- 2016–2018 Acura MDX
- 2015–2019 Acura TLX
- 2015–2017 Honda Accord

4.      But Honda did not replace the faulty Denso pump as part of the 2019 recall. Instead, it updated the software on the 2019 Recalled Vehicles, which was cheaper than replacing the pump. This "fix" was plainly insufficient, as Honda has now acknowledged: on May 28, 2020, Honda submitted a Safety Recall Report to NHSTA, covering the *very same pump* at issue in the 2019 recall (with the 17045-prefix). But, even as Honda recognizes the safety hazard caused by the Denso pump, it has refused to recall and fix the 2019 Recalled Vehicles. Instead, it has limited the recall to the following vehicles, totaling approximately 136,000 vehicles in the United States (and nearly 1.4 million worldwide) (collectively, the "2020 Recalled Vehicles"):[2]

- 2018–2019 Acura NSX
- 2019 Acura RDX
- 2019 Acura RLX
- 2019 Acura RLS Sport Hybrid
- 2018–2019 Honda Accord
- 2018–2019 Honda Civic Hatchback

---

[1] A true and correct copy of the 2019 Safety Recall Report is attached as Exhibit A to this Complaint.

[2] Following its May 28, 2020 recall, it issued a second recall on June 23, 2020, which removed just 62 vehicles from the prior recall. A true and correct copy of the June 23, 2020 Safety Recall Report is attached as Exhibit B to this Complaint.

- 2018–2019 Honda Civic Type R
- 2019 Honda Fit
- 2018–2019 Honda HR-V
- 2019–2020 Honda Insight

5.      On June 24, 2020 (just two weeks after Plaintiff Nathaniel Booker filed his initial Complaint), Honda submitted a subsequent recall report to NHTSA, revealing for the first time that customer notification of the Fuel Pump defect "is expected to begin on or about July 22, 2020."[3] It also stated that "[w]hen remedy parts are available, Honda will notify owners in a follow-up letter" (*id.*), which strongly suggests that Honda will notify customers about a defect, but will not have the parts on hand to fix it.

6.      The Affected Vehicles in this case accordingly are all Acura and Honda vehicles with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles. If further investigation reveals that additional Honda and Acura vehicles contain the same defective low-pressure fuel pumps and assemblies, then the models identified as Affected Vehicles may be amended.

7.      The 2019 Safety Recall Report identified a dangerous defect in the low-pressure fuel pump, which can fail and cause the Affected Vehicles to unexpectedly stall, sputter, and cause engine shutdown. According to the 2019 Safety Recall Report, "[s]odium particulates contained in low quality fuels can adhere to certain internal components in the fuel pump, increasing electrical and mechanical resistance and reducing fuel pump performance. If a vehicle is operated in high ambient temperature, reduced fuel pump performance can restrict vehicle acceleration and/or cause an engine stall, which increases the risk of a crash."[4]

---

[3] A true and correct copy of the June 24, 2020 Safety Recall Report is attached as Exhibit C to this Complaint.

[4] *Id.* at 10.

- 3 -

8.      The 2020 Safety Recall Report expanded on the nature of the defect of the low-pressure pump:[5]

> Affected vehicles may be equipped with a fuel pump module manufactured with low density impellers. If the surface of the lower density impeller is exposed to production solvent drying for longer periods of time, higher levels of surface cracking may occur. These cracks may lead to excessive fuel absorption, resulting in impeller deformation. ***Over time, if an impeller deforms to a point that creates sufficient interference with the fuel pump body, the fuel pump becomes inoperative***, which may cause illumination of the Malfunction Indicator Lamp in the instrument panel.

9.      The 2020 Safety Recall Report also described the risk posed by the defect: "Fuel pump inoperability could prevent an engine from starting or stall an engine while driving, **increasing the risk of a crash**."[6]

10.      Even now, after Honda has faced lawsuits related to the Fuel Pump Defect, and even as it represents to this Court that "Honda issued a recall offering free repairs,"[7] Honda *still* has not recalled all of the Affected Vehicles. For example, on August 13, 2020, an owner of a 2018 Honda Accord reported to NHTSA as follows:

> IN JANUARY[,] I MADE A RIGHT TURN INTO TRAFFIC AND THE CAR COMPLETELY STALLED ON ME AND STOP RUNNING. I PUT IT IN PARK AND RESTARTED IT. THIS WAS A VERY FRIGHTENING EXPERIENCE, AND I FELT LIKE I PUT MYSELF AND 2 OTHER PASSENGERS IN DANGER. I TOOK IT INTO MY DEALER COGGIN HONDA IN FORT PIERCE FLORIDA TO BE CHECKED. THEY FOUND NO OBVIOUS REASON FOR THIS STALL. SOMETIME LATER, I READ ABOUT THE RECALL ON THE FUEL PUMP THAT DESCRIBED MY EVENT EXACTLY AS I HAD EXPERIENCD IT. WHEN I CHECKED THE RECALL, MY VIN # 1HGCV1F59JA132632[8] IS NOT INCLUDED IN THE RECALL. I HAVE CONTACTED

---

[5] Exhibit B, at 6 (emphasis added).

[6] Exhibit B, at 7 (emphasis added).

[7] *See* ECF No. 23-1, at 1.

[8] As of August 17, 2020, based on Honda's website (owners.honda.com), this vehicle currently has no safety recalls.

- 4 -

MY DEALER AND YOUR PUBLIC RELATIONS THAT
SAID THEY CAN NOT REPAIR MY CAR BECAUSE ITS
NOT ON THE LIST. I HAVE SAFELY DRIVEN
HONDAS FOR MANY YEARS BUT WITH THIS
SITUATION I NO LONGER FEEL SAFE DRIVING THIS
VEHICLE AND HESITATE TO TRADE IT IN FOR
SOMEONE ELSE TO DRIVE.[9]

11.    As this Accord owner's account visibly demonstrates, the Fuel Pump

Defect endangers drivers, passengers, and other persons and property in the vicinity of

an Affected Vehicle at any time that it is in motion. The Fuel Pump Defect thus

renders the Affected Vehicles less safe and less valuable than consumers would

reasonably expect and it makes them less safe and less valuable than the Affected

Vehicles would be if Honda did not design and sell the Affected Vehicles with the

Fuel Pump Defect.

12.    Plaintiffs accordingly bring this class action complaint to recover on

behalf of the Class all relief to which they are entitled, including but not limited to the

recovery of the purchase price of their vehicles, compensation for overpayment and

diminution in value of their vehicles, out-of-pocket and incidental expenses, and an

injunction compelling Honda to replace or recall and fix the Affected Vehicles.

## II.    PARTIES

**A.    Plaintiffs**

13.    Plaintiffs and each and every Class member have suffered an

ascertainable loss as a result of Honda's omissions and/or misrepresentations

associated with the Affected Vehicles, including but not limited to out-of-pocket loss

and diminished value of the Affected Vehicles.

14.    Neither Honda, nor any of its agents, dealers, or other representatives,

informed Plaintiffs or Class members of the Fuel Pump Defect in the Affected

Vehicles prior to purchase.

---

[9] NHTSA ID. No. 11348991.

- 5 -

010928-12/1336608 V1

15.     Plaintiffs received information about the characteristics, benefits, safety, and quality of the Affected Vehicles at the dealership and/or through Honda's extensive advertising concerning quality and safety, as intended by Honda. None of the information Plaintiffs received disclosed the Fuel Pump Defect prior to the vehicle's purchase.

### 1.     Plaintiff Nathaniel Booker

16.     Plaintiff Nathaniel Booker (for purposes of this section, "Plaintiff") is a resident of the State of Florida, domiciled in Tampa, Florida. On or about May 18, 2018, Plaintiff purchased a new 2019 Honda Accord (for the purpose of this section, the "Affected Vehicle") from a private seller in Tampa, Florida. Plaintiff still owns the vehicle.

17.     Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Honda's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

18.     Plaintiff has experienced loss of power problems with his Affected Vehicle, including sputtering and stalling.

19.     Plaintiff uses the Affected Vehicle for personal and family uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Honda placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

- 6 -

20.     Honda never told Plaintiff about the Fuel Pump Defect, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Honda vehicle because he believed Honda's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Honda would be unable to repair the defect. Had Honda disclosed the Fuel Pump Defect, and the fact that Honda would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

**2.      Plaintiff Nina Tepirdzhyan**

21.     Plaintiff Nina Tepirdzhyan (for purposes of this section, "Plaintiff") is a resident of the State of California, domiciled in California City, California. On or about February 14, 2018, Plaintiff leased a new 2018 Civic Hatchback (for the purpose of this section, the "Affected Vehicle") from Metro Honda, a Honda-authorized dealership in Montclair, California. Plaintiff still leases the vehicle. Her vehicle is currently not under recall, and it has not been recalled to fix the Fuel Pump Defect.

22.     Unknown to Plaintiff at the time the Affected Vehicle was leased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Honda's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

23.     Plaintiff has experienced loss of power problems with her Affected Vehicle, including sputtering and stalling. On at least a dozen occasions, she has been

unable to start the vehicle or it begins to sputter when she accelerates on the freeway. As a result, Plaintiff tries to stay in the right-hand lane in case she needs to pull over.

24.    Plaintiff uses the Affected Vehicle for personal and family uses. Prior to leasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Honda placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to lease the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

25.    Honda never told Plaintiff about the Fuel Pump Defect, so Plaintiff leased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Honda vehicle because she believed Honda's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Honda would be unable to repair the defect. Had Honda disclosed the Fuel Pump Defect, and the fact that Honda would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have leased the Affected Vehicle or would have paid less for it.

**3.    Plaintiff Justin Foust**

26.    Plaintiff Justin Foust (for purposes of this section, "Plaintiff") is a resident of the State of Kentucky, domiciled in London, Kentucky. On or about September 28, 2016, Plaintiff purchased a new 2016 Honda Accord (for the purpose of this section, the "Affected Vehicle") from Neil Huffman Honda, a Honda-authorized dealership in Jeffersonville, Indiana. Plaintiff still owns the vehicle.

- 8 -

27.     Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Honda's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

28.     Plaintiff has experienced loss of power problems with his Affected Vehicle, including sputtering when he stepped on the gas. In 2019, there was a recall issued related to this problem in his Affected Vehicle, and the dealership updated his software. But this recall did not fix the Fuel Pump Defect.

29.     Plaintiff uses the Affected Vehicle for personal and family uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Honda placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

30.     Honda never told Plaintiff about the Fuel Pump Defect, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Honda vehicle because he believed Honda's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Honda would be unable to repair the defect. Had Honda disclosed the Fuel Pump Defect, and the fact that Honda would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have

- 9 -

received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

### 4. Plaintiff Jay Patel

31.    Plaintiff Jay Patel (for purposes of this section, "Plaintiff") is a resident of the State of Virginia, domiciled in Henrico, Virginia. In or around September 2019, Plaintiff purchased a new 2019 Acura MDX (for the purpose of this section, the "Affected Vehicle") from Crown Acura Richmond, an Acura-authorized dealership in Henrico, Virginia. Plaintiff still owns the vehicle, which is currently not under any safety recall.

32.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Honda's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

33.    Plaintiff uses the Affected Vehicle for personal and family uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Honda placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

34.    Honda never told Plaintiff about the Fuel Pump Defect, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Honda vehicle because he believed Honda's persistent advertising messaging that its vehicles

- 10 -

were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Honda would be unable to repair the defect. Had Honda disclosed the Fuel Pump Defect, and the fact that Honda would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

### 5.    Plaintiff Elizabeth Lawrence Staples

35.    Plaintiff Elizabeth Lawrence Staples (for purposes of this section, "Plaintiff") is a resident of the State of Pennsylvania, domiciled in Gibsonia, Pennsylvania. On or about September 4, 2017, Plaintiff purchased a new 2017 Acura MDX (for the purpose of this section, the "Affected Vehicle") from Baierl Acura, a Honda-authorized dealership in Wexford, Pennsylvania. Plaintiff still owns the vehicle, which is not currently under a safety recall.

36.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Honda's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

37.    Plaintiff uses the Affected Vehicle for personal and family uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Honda placed on the window. The window sticker advertised the Affected Vehicle's various features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

- 11 -

38.    Honda never told Plaintiff about the Fuel Pump Defect, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Honda vehicle because she believed Honda's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Honda would be unable to repair the defect. Had Honda disclosed the Fuel Pump Defect, and the fact that Honda would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

**6.    Plaintiff Mohammed Karimzada**

39.    Plaintiff Mohammed Karimzada (for purposes of this section, "Plaintiff") is a resident of the State of New York, domiciled in Plainview, New York. In or around December 2018, Plaintiff purchased a used 2017 Honda Accord (for the purpose of this section, the "Affected Vehicle") from a private seller in New York. Plaintiff still owns the vehicle, which is not currently under any safety recall.

40.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a fuel delivery system that was defective and did not function safely, as advertised, or as intended by its design. Honda's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Fuel Pump Defect has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

41.    Plaintiff uses the Affected Vehicle for personal and family uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that Honda placed on the window. The window sticker advertised the Affected Vehicle's various

- 12 -

features (such as the price, specifications, gas mileage, equipment and warranty details, and crash test ratings), and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

42.     Honda never told Plaintiff about the Fuel Pump Defect, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for a Honda vehicle because he believed Honda's persistent advertising messaging that its vehicles were of high quality, were safe, and were reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had a defect or the fact that Honda would be unable to repair the defect. Had Honda disclosed the Fuel Pump Defect, and the fact that Honda would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

**B.      Defendant**

43.     Defendant American Honda Motor Co., Inc. is a California corporation with its headquarters in Torrance, Los Angeles County, California.

44.     Honda manufactured, sold, and warranted the Affected Vehicles throughout the United States. Honda and/or its agents, divisions, or subsidiaries designed, manufactured, and installed the defective fuel delivery system in the Affected Vehicles.

45.     In this Complaint, when reference is made to any act, deed or conduct of Defendant or Honda, the allegation means that Defendant engaged in the act, deed or conduct by or through one or more of its officers, directors, agents, employees, or

- 13 -

representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant.

46.    Honda sells cars in part via communications that it authorized its dealers to make about Honda vehicles, including the Defective Vehicles discussed herein. This includes authorizing Honda dealers to distribute brochures and other marketing and promotional material. Honda, through its authorized dealers, has and had the opportunity to disclose all material facts relating to the Defective Vehicles.

47.    Authorized Honda dealers are Honda's agents, such that an opportunity to receive information from an authorized Honda dealership is an opportunity to receive information directly from Honda itself. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015). This agency relationship is established by the fact that, among other things: Honda's logo is displayed at authorized dealerships; Honda issues technical bulletins and service instructions to dealerships detailing potential vehicle problems, and also relies on them to push software updates to customers' vehicles; Honda distributes various advertising and promotional material to its dealerships, including brochures, booklets, and pamphlets; and under the terms of its express warranty, Honda requires its customers to return to its authorized dealerships to perform warranty repairs.[10]

48.    Furthermore, Honda's relationship with its dealerships is governed by a dealership agreement[11] that imposes a number of reciprocal obligations on both parties. Among other things, it requires:

---

[10] *See* New Vehicle Limited Warranty (2018) ("NVLW"), available at https://owners.honda.com/Documentum/Warranty/Handbooks/2018_Honda_Warranty _Basebook_AWL05251_FINAL.pdf (last visited June 10, 2020). For example, page 12 of both the 2018 and 2019 warranties states, in relevant part: "[u]nder normal circumstances, Honda will pay for warranty repairs only when they are performed at an authorized Honda repair facility."

[11] A copy of Honda's Automobile Dealer Sales and Service Agreement (Dealership Agreement), filed with the U.S. Securities and Exchange Commission, is attached as Exhibit D hereto. A true and correct copy is also available at https://www.sec.gov/

- 14 -

- that Honda offer to dealers "general and specialized product information and … provide field sales personnel to advise and counsel Dealer's sales organization on sales-related subjects such as merchandising, training, and sales management," (Dealership Agreement § 1.2.A), as well as "general and specialized service and parts training courses" (*id.* § 1.2.B);

- that Honda make available to dealers: (1) "sample copies of building layout plans or facility planning recommendations, including sales, service and parts space and the placement, installation and maintenance of recommended signs[;]" as well as, "from time to time," (2) "representatives … to counsel and advise Dealer and its personnel in connection with Dealer's planning and equipping the Dealership Premises" (*id.* § 1.3);

- that Honda make available "such sales, service and parts manuals, brochures, special service tools and equipment and other data for Honda Products as American Honda deems necessary for Dealership Operations" (*id.* § 1.4);

- that Honda "agree to maintain a nationwide system of authorized dealerships of Honda Products" and that, "[i]n order that those authorized dealers may be assured of the benefits of comprehensive advertising of Honda Products," Honda agree to "establish and maintain general advertising programs in such manner and amount as it may deem appropriate and will make sales promotion and campaign materials available" to dealers (*id.* § 1.5);

- that dealers "promote and sell, at retail, Honda Products, and … promote and render service, whether or not under warranty, for those products within the Dealer's Primary Market Area" (*id.* § 3.1);

- that dealers "agree[] to establish and maintain an adequate and trained sales and customer relations organization," and "agree[] to establish and maintain

---

Archives/edgar/data/1019849/000095012402000556/k66280ex10-2_3.txt (last visited June 10, 2020).

- 15 -

a complete service and parts organization, including a qualified service
manager and a qualified parts manager and a number of competent service
and parts personnel adequate to care for the service obligations to be
performed by Dealer under the Agreement" (*id*. § 3.3);

- that dealers "agree[] to acknowledge, investigate and resolve satisfactorily
  all complaints received from owners of Honda Products in a businesslike
  manner in order to secure and maintain the goodwill of the public, and to
  "promptly report[]" to Honda "[a]ny complaint received by Dealer which …
  cannot be readily remedied" (*id*. § 3.4);

- that dealers "will follow all reasonable directives, suggestions and policies of
  American Honda," and that "[a]ll written directives, suggestions and policies
  of American Honda contained in any of its bulletins or manuals, which are in
  effect as of the date of the Agreement or are issued thereafter, will be
  deemed a part of the Agreement" (*id*. § 3.9);

- that dealers "perform any and all warranty, recall, product improvement or
  product update service in compliance with instructions and directives issued
  by American Honda, regardless of where the Honda Product involved was
  purchased," and that "to protect and maintain the goodwill and reputation of
  Honda Products and the Honda Trademarks," dealers "agree[] that [they]
  will not charge any customer for warranty service or any work done in
  connection with such warranty, recall, product improvement or update or any
  other service as to which Dealer is reimbursed by American Honda" (*id*.
  § 3.12);

- that dealers "understand[] and agree[] that the only warranties that will be
  applicable to Honda Products will be such written warranty or warranties as
  may be furnished by American Honda." The same provision states: "Except
  for its express liability under such written warranties, American Honda

- 16 -

neither assumes nor authorizes any other person or party to assume for it any
other obligation or liability in connection with any Honda Product or
component thereof" (*id.* § 4.1);

- that dealers "agree[] that [they] will expressly incorporate any warranty
  furnished by American Honda with a Honda Automobile as a part of each
  order form or other contract for the sale of such Honda Automobile by
  Dealer to any buyer," "agree that [they] will deliver to the buyer of all Honda
  Products, at the time of delivery of such Honda Products, copies of such
  applicable warranties as may be furnished by American Honda," and
  "agree[] to abide by and implement in all other respects American Honda's
  warranty procedures in effect at the time of Dealer's sale" (*id.* § 4.2);

- that dealers "agree[] to develop and actively utilize programs for the
  advertisement and promotion of Honda Products and its servicing of such
  products." The provision further states: "Such programs will include the
  prominent display and use or demonstration of Honda Automobiles. Dealer
  further agrees to cooperate with all reasonable promotional programs
  developed by American Honda" (*id.* § 5.1);

- that dealers "agree[] that [they] will not advertise, promote or trade in Honda
  Products or the servicing thereof in such a manner as to injure or be
  detrimental to the goodwill and reputation of American Honda and the
  Honda Trademarks." The provision further states: "Dealer further agrees that
  it will not publish or otherwise disseminate any advertisement or
  announcement or use any form or media of advertising which is
  objectionable to American Honda. Dealer agrees to discontinue immediately
  any advertisement or form of advertising deemed objectionable upon request
  of American Honda" (*id.* § 5.2);

- 17 -

- that dealers, "[s]ubject to applicable federal, state or local ordinances, regulations and statutes, … agree[] to erect and maintain, at the Dealership Location, at Dealer's expense, authorized product and service signs of types required by American Honda, as well as such other authorized signs as are necessary to advertise the Dealership Operations effectively and as are required by American Honda" (*id.* § 5.3);

- that dealers "agree[] that American Honda has the exclusive right to and to control the use of the Honda Trademarks and but for the right and license granted by Paragraph 6.2 hereof to use and display the Honda Trademarks, Dealer would have no right to use the same" (*id.* § 6.1);

- that dealers are "granted the nonexclusive right and license to use and display the Honda Trademarks at the Dealership Premises." The provision further states: "Such use or display is limited to that which is necessary in connection with the sale, offering for sale and servicing of Honda Products at retail at the Dealership Location. Dealer agrees that it will promptly discontinue the use of any of the Honda Trademarks or change the manner in which any of the Honda Trademarks is used when requested to do so by American Honda" (*id.* § 6.2);

- that dealers "agree[] to keep complete and current records regarding the sale and servicing of Honda Products and to prepare for American Honda such reports, based on those records, as American Honda may reasonably request." The provision further states: "In order that policies and procedures relating to the applications for reimbursement for warranty and other applicable work and for other credits or reimbursements may be applied uniformly to all authorized dealers, Dealer agrees to prepare, keep current and retain records in support of requests for reimbursement or credit in

- 18 -

accordance with policies and procedures designated by American Honda" (*id.* § 7.3);

- that dealers "agree[] to permit, during reasonable business hours, American Honda, or its designee, to examine, audit, reproduce and take copies of all reports, accounts and records pertaining to the sale, servicing and inventorying of Honda Products, including, but not limited to, records in support of claims for reimbursement or credit from American Honda, and with the prior approval of Dealer, which approval will not be unreasonably withheld, to interview Dealer employees with respect thereto" (*id.* § 7.4);

- that the Dealership Agreement is terminated where a dealer fails "to provide adequate representation, promotion, sales or service, including warranty work" (*id.* § 9.4.N); and that, "not later than the effective date of the termination or expiration of the Agreement," dealers "will, at [their] sole expense, discontinue any and all uses of any Honda Trademarks and any words, symbols and marks which are confusingly similar thereto; will remove all signs bearing any Honda Trademark and will destroy all stationery, repair orders, advertising and solicitation materials, and all other printed matter bearing any Honda Trademark or referring directly or indirectly to American Honda or Honda Products in any way which might make it appear to members of the public that Dealer is still an authorized dealer," including, but not be limited to, "discontinuing the use of a Honda Trademark as part of Dealer's business and corporate name." The provision continues: "Dealer will also deliver to American Honda, at American Honda's place of business, or to a person designated by American Honda, or will destroy the same upon request by American Honda, any and all technical or service literature, advertising and other printed material then in Dealer's possession which relates to Honda Products and which was

- 19 -

acquired or obtained by Dealer from American Honda. Dealer will destroy any sign bearing a Honda Trademark which has not been repurchased by American Honda." (*id.* § 10.3).

## III.    JURISDICTION

49.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

50.    This Court has personal jurisdiction over Honda by virtue of its transacting and doing business in this District, including locating and operating its headquarters in Torrance, California, in this District. Honda has purposefully availed itself of the benefits and protections of the Central District of California by continuously and systematically conducting substantial business in this judicial district. Honda has intentionally and purposefully sold, supplied, and distributed Affected Vehicles into the stream of commerce within California and throughout the United States.

51.    This Court has personal jurisdiction over Honda by virtue of its transacting and doing business in this District, including locating and operating its headquarters in this District.

## IV.    VENUE

52.    Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Honda licenses authorized dealers in this District, it advertises in this District, and it profits from its activities conducted within this District.

- 20 -

# V.    FACTUAL ALLEGATIONS

## A.    Honda's History of Defective Fuel Delivery Systems

53.    Honda sources many of the electrical components in its vehicles from Denso Corporation, a Japanese auto parts supplier. As early as 2015, Denso had recognized that the low-pressure fuel pumps that it supplied to Honda and other manufacturers were prone to failure. In a patent application filed in 2016, Denso admitted that the composite (plastic) impellers in their low-pressure fuel pumps "may be swelled due to the fuel and water contained in the fuel, therefore a rotation of the impeller may be stopped when the impeller is swelled and comes in contact with the [fuel pump] housing."[12] The defect described by the patent application is virtually the same as the Fuel Pump Defect at the heart of this case.

54.    Honda has even admitted knowing about the Fuel Pump Defect as early as January 2016, when it first "received the first report of an engine stall."[13] It further admits to beginning an investigation *more than two and a half years ago*. Honda stated that, during the August–September 2017 time period, and "[a]fter receipt of additional engine stall reports, Honda launched an investigation. Failed return parts were sent to the fuel pump supplier and the supplier was able to re-create the engine stalling condition with operating the fuel pump in 10 V mode."[14] Honda's investigation found that "fuel containing greater than one part per million of sodium could result in restricted vehicle acceleration and/or engine stall."[15]

55.    From July to November 2018, Honda reported that "[c]ontinued testing confirmed that fuel pump operating in 10 V mode allowed for the accumulation of

---

[12] U.S. Patent Application No. 15767375, *Impeller for Fuel Pump*, (application date Oct. 26, 2016) (Denso Corporation, et al. applicants), available at https://patentscope.wipo.int/search/en/detail.jsf?docId=US231859533 (last visited June 10, 2020).

[13] Exhibit A, at 2.

[14] *Id.* at 3.

[15] *Id.* at 3.

sodium in the fuel pump, which resulted in increased mechanical and electrical resistance and reduction in fuel pump performance. Depending on ambient temperatures, reduced fuel pump performance can lead to restricted/rough acceleration and/or an engine stall."[16]

56.    In the 2020 Safety Recall Report, Honda admitted that it had been investigating the 2020 defect for more than a year prior to the May 2020 recall (emphasis added):[17]

> February – May 2019
>
> Honda received the first report of fuel pump module failure from the Indian market and an investigation was launched. After supplier analysis of failed parts returned from the field, *it was confirmed that impeller swelling resulted in fuel pump module failure*.
>
> June – October 2019
>
> The investigation was elevated to the global Honda quality group for further handling. Honda hypothesized the impeller swelling was related to part toughness and investigated impeller density and clearance between the impeller and fuel pump wall. Re-creation testing confirmed the primary contributor to impeller swelling was the development of surface cracks on low density impellers exposed to production solvent drying for longer periods of time.
>
> March 2020
>
> Review of warranty data confirmed that vehicles equipped with fuel pump modules in transit for a longer period prior to vehicle assembly exhibited increased failure rates.
>
> April 2020
>
> Honda investigated the scope of vehicles installed with suspect fuel pump modules containing lower density impellers exposed to production solvent drying for longer periods of time.

---

[16] *Id*. at 6.

[17] Exhibit B, at 8-9.

- 22 -

May 21, 2020

> Honda determined that a defect related to motor vehicle safety existed and decided to conduct a safety recall.

> As of May 21, 2020, Honda has received 183 warranty claims, 68 field reports, and no reports of injuries or crashes related to this issue.

57.     On information and belief, even the large number of vehicles subjected to the 2019 Safety Recall Report and the 2020 Safety Recall Report does not capture all of the Affected Vehicles. It does not include all of the Honda and Acura vehicles that were equipped with Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefix 17045-, the single common part in every model that Honda has recalled for the admitted fuel delivery system defect.

**B.     Honda Has Not Remedied the Fuel Pump Defect in Affected Vehicles**

58.     The Fuel Pump Defect in the Affected Vehicles is dangerous to drivers, vehicle occupants, and innocent bystanders. As the statements from drivers of the Affected Vehicles demonstrate (*see infra* § V.C), a vehicle that fails to accelerate when demanded, or stalls while in motion, is simply unsafe to operate.

59.     Honda has not fixed the recalled vehicles, or any other Affected Vehicles, despite its admission of the existing safety defect relating to the low-pressure fuel pump. Owners of Affected Vehicles are left to speculate as to whether there will be a repair or replacement of the Fuel Pump Defect, and, if so, when. Even the June 24, 2020 Safety Recall Report stated that customer notification "is expected to begin on or about July 22, 2020,"[18] but includes the important caveat that "[w]hen remedy parts are available, Honda will notify owners in a follow-up letter." Honda apparently

---

[18] A true and correct copy of the June 24, 2020 Safety Recall Report is attached as Exhibit C to this Complaint.

decided to notify customers about the Fuel Pump Defect without having the parts available to fix the defect.[19]

60.     Rather than spend the money necessary to address the defect, or at least warn its customers that they have cars equipped with faulty fuel pumps, Honda has shifted the significant and serious risk of inoperable vehicles, accidents, injury and even death onto its customers.

61.     Honda has not recommended or advised that consumers stop driving Affected Vehicles pending repair or replacement of the Fuel Pump Defect. Even though it knows and admits that the Fuel Pump Defect could cause high-speed stalls and other dangerous conditions, Honda is unwilling to spend the money necessary to provide alternative transportation to its customers. Instead, it makes them chose between driving a car with a known dangerous defect, or driving nothing at all. On information and belief, hundreds of thousands of owners of Affected Vehicles have no idea that the low-pressure fuel pumps in their supposedly safe and reliable Honda and Acura vehicles have a known safety defect and have been the subject of a massive recall.

**C.     NHTSA Complaints Reveal That the Fuel Pump Defect Poses Serious Safety Risks**

62.     Affected Vehicle owner complaints to NHTSA describe harrowing traffic events and near misses, making perfectly clear that this is not a defect that Honda can continue to ignore.

63.     These complaints have gone back several years, further demonstrating that the defect affects more vehicles than those recalled by Honda. For example, on August 1, 2013, a 2013 Honda Accord owner reported to NHTSA as follows:

---

[19] Plaintiff Nathaniel Booker filed his Complaint on June 10, 2020, and specifically alleged that Honda has failed to notify customers about the defect. Apparently prompted by this Complaint, two weeks later, Honda issued its June 24 Safety Recall Report, revealing for the first time its customer notification plan.

- 24 -

THERE IS A HESITATION/JERK/SHUDDER WHEN ACCELERATING AT VARIOUS SPEEDS.[20]

64. On February 4, 2014, a 2013 Honda Accord owner reported to NHTSA as follows:

SINCE I FIRST PURCHASED MY 2013 HONDA ACCORD, THE HONDA HAS INTERMITTENT HESITATIONS AFTER STOPPING AT TRAFFIC LIGHTS, STOP SIGNS, PARKING AND SO FORTH. FOR INSTANCE, FOR THE SECOND TIME IN THE LAST FIVE DAYS, I STOPPED, WENT INTO A STORE, RETURNED, CRANKED HONDA ACCORD, BACKED OUT, AND THE CAR WOULD NOT "GO."[21]

65. On June 22, 2014, a 2014 Acura MDX owner reported to NHTSA as follows:

WHILE TRYING TO ACCELERATE DURING A LEFT TURN, THE ENGINE COMPLETELY LOST POWER AND THE ACCELERATOR WOULD NOT WORK. ALL ENGINE WARNING LIGHTS CAME ON. WE NEARLY AVOIDED AN ACCIDENT BY COASTING INTO THE CENTER LANE. I HAD TO TURN OFF THE CAR AND RESTART IN ORDER TO GAIN THE ABILITY TO ACCELERATE AGAIN, BUT ALL THE WARNING LIGHTS REMAINED ON. DROVE IT TO THE DEALER, BUT THEY HAVE YET TO BE ABLE TO DETERMINE WHAT THE PROBLEM IS. THIS IS THE 3RD TIME THIS HAS HAPPENED - ALL DURING THE FIRST 5 MINUTES OF DRIVING DURING THE MORNING. THE LAST INCIDENT COULD HAVE RESULTED IN A SERIOUS CRASH. *TR[22]

66. On October 2014, a 2014 Honda Accord owner reported to NHTSA as follows:

FROM TIME TO TIME WHEN I PRESS THE ACCELERATOR, THERE IS NO IMMEDIATE RESPONSE. IT MAY TAKE ANOTHER TRY TO GET THE ENGINE TO RESPOND. THIS MAINLY OCCURS

---

[20] NHTSA ID No. 10533047.
[21] NHTSA ID No. 10562814.
[22] NHTSA ID No. 10605016.

- 25 -

WHEN I NEED RAPID ACCELERATION FROM A STOP TO QUICKLY GET INTO TRAFFIC. I WAS TOLD THAT THE COMPUTER THAT CONTROLS THE FLY-BY-WIRE ACCELERATOR TAKES TIME TO COORDINATE WITH THE COMPUTER THAT CONTROLS THE CVT TRANSMISSION. I HAVE A SAFETY CONCERN WITH THIS

67.     On November 16, 2014, a 2014 Honda Accord owner reported to NHTSA as follows:

MY ACCELERATION CONDITIONS/PROBLEMS ARE IDENTICAL TO NHTSA ID #10607907 & SEVERAL OTHERS. UPON ACCELERATION THERE IS A SEVERE HESITATION TO THE POINT OF ALMOST STALLING BEFORE IT ACCELERATES. AT 15000 MILES IT APPEARS TO BE GETTING WORSE. I WAS ALSO TOLD BY A SERVICE REP THIS WAS COMPUTER CONTROLLED AND NOT CABLE CONTROLLED AS IN THE PAST. THERE DEFINITELY NEEDS TO BE A FIX TO THIS AS IT IS EXTREMELY DANGEROUS PULLING OUT IN TRAFFIC.[23]

68.     On November 28, 2014, a 2014 Honda CR-V owner reported to NHTSA as follows:

CAR HESITATES RANDOMLY FROM DEAD STOP. STARTS OFF AT ABOUT 2 MPH AND DOES NOT ACCELERATE UNTIL 5 TO 10 SECONDS EVEN THOUGH YOU ARE PRESSING ON GAS PEDAL. HONDA HAS NO EXPLANATION FOR THE RANDOM OCCURRENCE. THIS HAS HAPPENED TO ME AT LEAST 20 TIMES. DOES NOT SHOW UP ON COMPUTER DIAGNOSTICS. REPLACED 2014 CR-V AFTER 10 WEEKS WITH 2015 CR-V. 2015 MODEL HAS DIFFERENT ISSUES. NO MORE HONDAS!!! TOOK A BIG FINANCIAL HIT ON REPLACING A 2014 CR-V AFTER 10 WEEKS WITH A 2015 CR-V. CAR TOO DANGEROUS TO DRIVE. *TR[24]

69.     On December 1, 2014, a 2014 Honda Accord owner reported to NHTSA as follows:

---

[23] NHTSA ID No. 10655300.
[24] NHTSA ID No. 10661194.

- 26 -

1          SIMILAR TO NHTSA COMPLAINTS #10619205,
#10607907, #10655300, #10630708, AND #10628501.
DRIVING MY VEHICLE ON INTERSTATE, GOING
APPROXIMATELY 70 MPH. THE VEHICLE CAME TO
A LARGE INCLINE AND BEGAN ACCELERATING,
AND ALL OF A SUDDEN, THE ENTIRE VEHICLE
SHUDDERED VIOLENTLY AND LOST ALL
ACCELERATION, AND THE MALFUNCTION
INDICATOR LAMP CAME ON AND WAS BLINKING.
IT FELT LIKE THE VEHICLE HAD SHIFTED OUT OF
GEAR, AND IT COULD NOT GET BACK IN GEAR.
AFTER OVER 10 MINUTES, I RESTARTED THE
VEHICLE, AND THE LIGHT DID NOT COME BACK
ON. ALTHOUGH I COULD FEEL THAT PUSHING ON
THE GAS PEDAL DID NOT FEEL THE SAME, AND IT
FELT AS IF THE VEHICLE WAS HESITATING AND
STRUGGLING TO SWITCH GEARS UP AND
ACCELERATE.[25]

70.    On April 10, 2015, a 2015 Acura TLX owner reported to NHTSA as

follows:

          TL* THE CONTACT OWNS A 2015 ACURA TLX. THE
CONTACT STATED THAT WHILE SLOWING TO
SPEEDS BETWEEN 3-5 MPH, THE VEHICLE
HESITATED TO ACCELERATE WHEN ENGAGING
THE ACCELERATOR PEDAL. THE CONTACT
INDICATED THAT THE FAILURE WAS
INTERMITTENT AND OCCURRED ON SEVERAL
OCCASIONS. THE CAUSE OF THE FAILURE WAS
NOT DIAGNOSED. THE MANUFACTURER WAS NOT
NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE
WAS 200.[26]

71.    On September 9, 2015, a 2015 Honda Accord owner reported to NHTSA

as follows:

          WHILE IDLING DOWN THE STREET , I NOTICED
THAT THE TACHOMETER INDICATED AN RPM OF
LESS THAN 500. I DEPRESSED THE ACCELERATOR
TO MOVE FORWARD AND HAD NO RESPONSE . THE
ACCELERATOR WAS THEN DEPRESSED ALL THE
WAY TO THE FLOOR WITH STILL NO RESPONSE.

---

[25] NHTSA ID No. 10661422.
[26] NHTSA ID No. 10704864.

- 27 -

THE ACCELERATOR WAS THE LETUP ALL OF THE WAY AND DEPRESSED AGAIN AND THE ENGINE SPEEDED UP AS NORMAL. THIS SAME PROBLEM WAS EXPERIENCED IN A 2013 HONDA THAT WE JUST TRADED IN FOR THE SAME PROBLEM THAT EXISTED FOR THE TWO YEARS THAT WE OWNED IT. THIS COULD BE A DANGEROUS SITUATION IF IT OCCURRED IN HEAVY TRAFFIC OR ON A FREEWAY. HONDA SAYS THAT THESE ARE THE ONLY TWO VEHICLES THAT HAVE EVER BEEN REPORTED WITH THIS KIND OF PROBLEM. PLEASE ENTER THIS AS A POTENTIALLY SERIOUS TRAFFIC PROBLEM[.][27]

72.    On November 7, 2015, a 2014 Honda Accord owner reported to NHTSA as follows:

MY 2014 HONDA ACCORD COUPE HAS 33,900+ MILES AND FOR THE PAST YEAR, I HAVE HAD IT IN TO FOX HONDA IN GRAND RAPIDS FOUR TIMES FOR THE SAME PROBLEM. THE PROBLEM IS, THAT IT STUTTERS OFTEN WHEN ACCELERATING AND TWICE, THE ENGINE HAS STALLED OUT AND HAD TO BE RESTARTED.[28]

73.    On November 10, 2015, a 2015 Honda Accord owner reported to NHTSA as follows:

INTERMITTENTLY, BUT ALWAYS UPON ACCELERATION (COULD BE PULLING ONTO THE HIGHWAY FROM A STOPPED POSITION, MERGING/SPEEDING UP TO GET ON THE HIGHWAY OR PASS ANOTHER VEHICLE, OR STARTING TO MOVE WHEN THE LIGHT TURNS GREEN) THE CAR WILL FALL FLAT WITH NO POWER. IT DOESN'T STALL, JUST DOESN'T RESPOND TO THE GAS PEDAL. MOST TIMES, HAPPENS IN SECOND GEAR. RELEASING THE GAS PEDAL AND THEN PRESSING IT AGAIN MOST TIMES RESOLVES THE PROBLEM. SOMETIMES, IT TAKES A FEW TRIES. THIS IS A VERY DANGEROUS PROBLEM, AND I HAVE HAD MANY MOTORISTS SWERVE AROUND ME OR BLOW THE HORN AT ME BECAUSE I CAN'T GET THE CAR

---

[27] NHTSA ID No. 10789468.
[28] NHTSA ID No. 10788979.

- 28 -

MOVING FAST ENOUGH. I JUST SPENT $30,000 ON THIS NEW CAR, AND THE DEALERSHIP CANNOT DUPLICATE THE PROBLEM SO THEY'RE SENDING ME ON MY WAY WITH A VEHICLE THAT'S A POTENTIAL DEATH TRAP.[29]

74.     On December 9, 2015, a 2015 Honda Accord owner reported to NHTSA as follows:

WHILE DRIVING IN STOP AND GO TRAFFIC, EITHER ON THE HIGHWAY OR ON RESIDENTIAL STREETS, OCCASIONALLY, THE VEHICLE WILL HESITATE. THIS HESITATION WILL LAST 1-3 SECONDS AND THEN THE VEHICLE WILL ACCELERATE AS EXPECTED. THIS HESITATION CAN CAUSE A DANGEROUS SITUATION SINCE THE VEHICLE WILL NOT MOVE AS EXPECTED. THE VEHICLE WAS PURCHASED NEW, AND THIS HAS OCCURRED SINCE ITS PURCHASE. I'VE TAKEN IT TO THE HONDA DEALER, BUT THEY CAN NOT DUPLICATE IT SINCE IT IS AN INTERMITTENT ISSUE. THEIR RESPONSE WAS TO STOP USING THE ECON BUTTON. I HAVE STOPPED USING THIS FEATURE, BUT THE ISSUE HAS PERSISTED, (ALTHOUGH IT HAS LESSENED IN OCCURRENCES). THE ISSUE CAN OCCUR 1-2 TIMES PER WEEK, WITH THE LAST OCCURRENCE ON 12/8/15. THERE IS A TECHNICAL SERVICE BULLETIN ON THE VEHICLE 15-036, WHICH MAY OR MAY NOT BE RELATED, BUT LAST TIME AT THE DEALER, THEY COULDN'T FIND THE TSB, SO THE SOFTWARE UPDATE LIKELY HAS NOT BEEN MADE TO THE VEHICLE.[30]

75.     On March 9, 2016, a 2015 Honda Accord owner reported to NHTSA as follows:

WHEN YOU PRESSURE [sic.] ON THE ACCELERATOR PEDAL TO POWER THE VEHICLE (LIKE PULLING OUT INTO TRAFFIC OR CHANGING LANES IN TRAFFIC, THE CAR STALLS AND PUT YOU AT RISK OF GETTING INTO AN ACCIDENT. IT HAPPENS SITTING AT A TRAFFIC LIGHT OR DRIVING 55 MPH AND TRYING TO CHANGE LANES. DOES NOT

---

[29] NHTSA ID No. 10789468.
[30] NHTSA ID No. 10809192.

MATTER IF THE CAR IS WARM OR COLD, BUT
OCCURS LESS WHEN COLD.[31]

76.    On July 30, 2016, a 2013 Honda Civic owner reported to NHTSA as follows:

VEHICLE HESITATES UNDER ACCELERATION.
SOMETIMES ALMOST STALLING. I FEEL THIS IS
NOT SAFE FOR MY SON AT TIMES. MERGING ETC.[32]

77.    On September 30, 2016, a 2016 Acura MDX owner reported to NHTSA as follows:

NOTHING BUT TROUBLE SINCE I BOUGHT IT.
PURCHASED JAN 2016. HAS REPLACED ---
NAVIGATION, AMPLIFIER & FUEL PUMP!!!

OWNED 2016 MDX FOR LESS THAN A WEEK-
VEHICLE JOLTS FORWARD-GIVES ITSELF EXTRA
GAS EVEN WHEN YOUR FOOT IS ON THE BRAKE!
TRANSMISSION NOT SMOOTH. BEEN IN FOR
SERVICE OVER 40 DAYS NOW (TOTAL). HESITATES
SOMETIMES- WAS STUCK AT 15 MPH FOR A FEW
MINUTES. RADIO GOES UNRESPONSIVE- NO
BUTTONS WORK GETS STUCK AT STATION/VOL
CAN'T TURN OFF EITHER. NAVIGATION DIED-
TURNED OFF, THEN FLICKERED(WAS REPLACED) .
SPEAKERS WENT FLAT- AMPLIFIER DIED (WAS
REPLACED). THE ENGINE IDLE FEATURE DOESN'T
WORK RIGHT. IT DOESN'T KEEP MY SAMSUNG
PHONE CHARGED. I'VE TRIED MULTIPLE CORDS
INCLUDING THE ORIGINAL ONE THAT CAME WITH
PHONE. ACURALINK DOESN'T ALWAYS WORK
EITHER. I SENT A DESTINATION BUT IT DOESN'T
SHOW UP FOR A FEW HOURS OR DAYS! IT TWEETS
NOW. THE WINDOW NOW SQUEAKS (NO, IT IS NOT
TINTED OR ANYTHING). IT MAKES A STRANGE
DRIPPING NOISE WHEN YOU TURN IT OFF. IT EATS
GAS! I FILL IT UP AND IT'S GONE IN A BLINK..NOT
THE APPROPRIATE MILES. IT BEEPS LOUDLY AND
BLINKS THAT THERE IS AN OBJECT APPROACHING

---

[31] NHTSA ID No. 10854846.
[32] NHTSA ID No. 10891787.

- 30 -

FOR NO REASON- NO ONE/THING THERE- NOTHING MOVING. IT HAS A MIND OF IT'S OWN.

I'VE BEEN A LOYAL HONDA/ACURA OWNER FOR OVER 18 YEARS AND THEY HAVE NOT HELPED. WHEN THEY REPLACED THE NAVI THEY SAID THEY'D GIVE ME $500 FOR MY TROUBLE- BUT DIDN'T ANYWAY. THEY SAY THERE IS NOTHING WRONG WITH IT-- BUT JUST MONDAY SAID IT NEEDS A NEW FUEL PUMP BUT IS "SO NEW" THEY DON'T HAVE ONE SO IT HAD TO BE ORDERED. DISGRACEFUL. I ASKED FOR IT TO BE REPLACED- WAS DENIED. ACURA CLIENT REP SAYS- "AT THIS TIME THERE IS NOTHING WE CAN DO" I HAVE A SPINAL CONDITION AND THE JOLTING HURTS ME GREATLY. SOMEDAYS I CAN'T DRIVE MY BRAND NEW VEHICLE BC I CANT TAKE THE PAIN. THEY DON'T CARE. THEY DON'T STAND BEHIND THEIR PRODUCT EITHER. HIGHLY DISAPPOINTED IN VEHICLE AND COMPANY[33]

78.    On October 5, 2016, a 2015 Honda CR-V owner reported to NHTSA as follows:

VEHICLE WILL NOT RESPOND WHEN FOOT IS PLACED ON THE ACCELERATOR. WHEN ATTEMPTING TO MOVE THE CAR FORWARD FROM A STOP SIGN OR SIGNAL LIGHT THE VEHICLE WILL NOT RESPOND TO THE GAS PEDAL FOR UP TO 5 SECONDS. BASICALLY THERE IS A DELAY FROM WHEN THE GAS PEDAL IS PRESSED UNTIL THE VEHICLE RESPONDS. THIS HAS HAPPENED 5 TIMES IN PAST 6 TO 7 WEEKS. THIS ACTION HAS HAPPENED WHEN ATTEMPTING TO MOVE FROM A COMPLETE STOP OR WHEN THE VEHICLE IS MOVING AT A VERY SLOW SPEED. I ESCAPED A NEAR REAR END COLLISION WHEN I REMOVED MY FOOT FROM THE BRAKE, PRESSED ON THE GAS PEDAL AND THE CAR DID NOT RESPOND.[34]

---

[33] NHTSA ID No. 10910814.
[34] NHTSA ID No. 10779918.

- 31 -

79.     On January 17, 2017, a 2016 Honda CR-V owner reported to NHTSA as follows:

> TL* THE CONTACT OWNS A 2016 HONDA CR-V. WHILE DRIVING VARIOUS SPEEDS, THE ACCELERATOR PEDAL WAS DEPRESSED. THE VEHICLE FAILED TO RESPOND WITHOUT WARNING. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE CONTACT STATED THAT THE FAILURE RECURRED SEVERAL TIMES. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 4,000. ...UPDATED 02/22/17 *BF[35]

80.     On February 14, 2017, a 2014 Honda Accord owner reported to NHTSA as follows:

> TL* THE CONTACT OWNS A 2014 HONDA ACCORD. WHILE DRIVING VARIOUS SPEEDS, THE VEHICLE HESITATED AND THEN LUNGED FORWARD WHEN THE ACCELERATOR PEDAL WAS DEPRESSED THE DEALER COULD NOT DETERMINE THE CAUSE OF THE FAILURE. THE FAILURE RECURRED INTERMITTENTLY. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 14,000. THE VIN WAS NOT AVAILABLE. UPDATED 05/17/17*LJ[36]

81.     On March 27, 2017, a 2014 Acura MDX owner reported to NHTSA as follows:

> VEHICLE HESITATES WITH ACCELERATION AND DOES NOT MAINTAIN CONSTANT SPEED. WITH ACCELERATION, THE VEHICLE HESITATES AND THEN LURCHES SUDDENLY. THE VEHICLE FAILS TO MAINTAIN A CONSTANT VELOCITY, ESPECIALLY GOING UP A SLIGHT GRADE, MOST NOTICEABLY AT 35MPH AND 45MPH.[37]

---

[35] NHTSA ID No. 10945745.
[36] NHTSA ID No. 10954427.
[37] NHTSA ID No. 10968675.

- 32 -

82.    On April 19, 2017, a 2017 Honda Accord owner reported to NHTSA as follows:

ACCORDING TO MY LOCAL HONDA DEALER
(HONDANATION KNOXVILLE), AND BASED ON MY
OWN EXPERIENCE, THE 2017 HONDA ACCORDS
HAVE A KNOWN "ACCELERATION LAG" PROBLEM.
OFTEN WHEN ACCELERATING FROM A
STATIONARY POSITION, OR EVEN A SLOW-TURN
OR MERGE POSITION, THERE CAN BE A 1 TO 3
SECOND DELAY BETWEEN PRESSING THE
ACCELERATOR AND ACTUALLY GETTING THE CAR
TO MOVE. THIS CAN PRESENT A HIGHLY SERIOUS
SITUATION. IN EFFECT, THE CAR CAN STALL FOR A
1 TO 3 SECOND PERIOD WHILE ONCOMING TRAFFIC
CLOSES IN ON YOU. SOMETIMES YOU CAN PRESS
THE ACCELERATOR ALL THE WAY TO THE FLOOR
WITH NO RESPONSE, ONLY TO HAVE THE CAR
"LURCH" A SECOND OR TWO LATER. THE PROBLEM
HAPPENS MOST FREQUENTLY IN CITY DRIVING
AFTER THE CAR HAS WARMED UP. MY LOCAL
HONDA DEALER SAYS THERE IS NO KNOWN FIX
FOR THIS WIDELY REPORTED PROBLEM. LOGIC
SAYS THAT AT SOME POINT SOMEONE WILL BE
SERIOUSLY INJURED BECAUSE OF THIS KNOWN
ACCELERATION LAG PROBLEM AFFECTING LATE
MODEL HONDAS.[38]

83.    On April 24, 2017, a 2016 Honda Accord owner reported to NHTSA as follows:

WHEN I STOP AND WANT TO TAKE OF[F] FAST
ACCELERATOR PEDAL DOES NOT RESPOND . I
THINK THIS IS VERY DANGEROUS IT HAS
HAPPENED SEVERAL TIMES[39]

84.    On June 9, 2017, a 2016 Honda Accord owner reported to NHTSA as follows:

THE PROBLEM IS WITH THE ACCELERATION OF
THE VEHICLE. IT TENDS TO AT TIMES TO JUST CUT
OUT ACCELERATING. WHEN THAT HAPPENS I TRY
TO PRESS THE PEDAL AGAIN, NADA,

---

[38] NHTSA ID No. 10979038.
[39] NHTSA ID No. 10980207.

- 33 -

1
2
3
4
5
6

      MILLISECONDS PASS AND THE ACCELERATOR
WILL TAKE OFF AT A HIGH RATE OF SPEED. IT'S
SCARY. TOOK IT TO THE DEALER AND FOUND
NOTHING WRONG. THE TECH TOLD ME THAT I
HAVE TO GET USED TO THE CVT. THIS GENERALLY
HAPPENS WHEN TURNING LEFT OR RIGHT. IT
HAPPENED ONE TIME WHILE TAKING OFF FROM A
DEAD STOP. WHILE PLACING THE CAR IN GEAR,
NADA.[40]

7
8

      85.    On October 19, 2017, a 2014 Honda Civic owner reported to NHTSA as follows:

9
10
11
12

      HESITATION WHEN PRESS ON ACCELERATOR.
THEY IS VERY DANGEROUS WHEN GETTING OUT
INTO TRAFFIC AND WHEN YOU PRESS ON
ACCELERATOR THERE IS A LONG HESITATION. I
HAVE REPORTED THIS TO HONDA SERVICE
NUMEROUS TIMES AND THEY SAY THIS IS
NORMAL AND CAN'T DUPLICATE THE ISSUE.[41]

13
14

      86.    On December 19, 2017, a 2018 Honda Accord owner reported to NHTSA as follows:

15
16
17
18

      THE CAR STUTTERS OR STAMMERS WHEN YOU
PRESS THE ACCELERATOR/GAS PEDAL AT TIMES,
IT DOES NOT DO IT AT ALL TIMES. IT IS
DANGEROUS. IT WAS STATIONARY AT A STOP
LIGHT, OR PULLLING OFF FROM A STOPPED
POSITION.

19
20

      87.    On September 5, 2018, a 2016 Honda CR-V owner reported to NHTSA as follows:

21
22
23

      HESITATION WHEN TRYING TO ACCELERATE.
HAPPENS ANYTIME- STEP ON THE GAS AND IT
TAKES A FEW SECONDS BEFORE THE
ACCELERATION STARTS.[42]

24
25
26
27
28

---

[40] NHTSA ID No. 10994167.
[41] NHTSA ID No. 11034722.
[42] NHTSA ID No. 11124554.

- 34 -

88.     On October 7, 2018, a 2018 Honda Accord owner reported to NHTSA as follows:

> TWO SEPARATE ISSUES: 1) WITH ONLY 2,400 MILES
> ON THE ACCORD, ON OCTOBER 7, 2018 IT
> SUDDENLY LOST POWER 2 OR 3 TIMES OVER A 60-
> MILE STRETCH OF THE BUSY 405 FREEWAY, EACH
> TIME SLOWING FROM 65 MPH TO APPROXIMATELY
> 30 MPH OR LESS DESPITE MAINTAINING EVEN
> PRESSURE ON THE ACCELERATOR. THE CAR DID
> NOT RESPOND TO PRESSURE ON THE GAS PEDAL.
> NO CRUISE CONTROL WAS USED AT ANY TIME.
> THE SUDDEN DECELERATION COULD HAVE
> CAUSED A SERIOUS ACCIDENT.
>
> 2) ON NOVEMBER 30, 2018, I ATTEMPTED TO
> RESUME MOTION AFTER STOPPING FOR A RED
> LIGHT. THE ACCORD'S GAS PEDAL FAILED TO
> RESPOND FOR APPROXIMATELY 5 TO 6 SECONDS,
> THEN SUDDENLY LURCHED FORWARD. THIS ALSO
> COULD HAVE CAUSED A SERIOUS ACCIDENT.[43]

89.     On October 15, 2018, a 2017 Honda CR-V owner reported to NHTSA as follows:

> I BOUGHT MY CR-V IN FEB 2017. SINCE 6TH OCT
> 2018 I HAVE BEGUN TO NOTICE HESITANCY
> PROBLEMS WITH ACCELERATION AFTER COMING
> TO A COMPLETE STOP AND IN SOME CASES THE
> ENGINE HAS ALSO STALLED. CAR WAS NOT IN
> ECON MODE, BEING DRIVEN ON 'D' MODE ON A
> CITY STREET. FACED SIMILAR ISSUE ON A
> HIGHWAY WHILE IN TRAFFIC. TODAY (15TH OCT)
> IT HAPPENED THRICE BACK TO BACK IN A 20
> MINUTE DRIVE ON A CITY STREET.[44]

90.     On December 10, 2018, a 2018 Honda CR-V owner reported to NHTSA as follows:

> I WAS FIRST IN LINE IN THE LEFT LANE ON A
> CROSS OVER TO A ONE WAY STREET THAT GOES
> FROM RIGHT TO LEFT. I WAS AT A STOP WAITING
> FOR A TIME I COULD TURN AND TRY TO GET OVER

---

[43] NHTSA ID No. 11155390.
[44] NHTSA ID No. 11140320.

- 35 -

4 LANES OF TRAFFIC. THERE ARE 4 LANES ON THE ONE WAY STREET WHICH IS M-59 ALSO KNOW AS HALL ROAD AND I WAS GOING TO HAVE TO GO FAST AS I WAS GOING TO HAVE TO FIRST GET IN THE FAR LEFT LANE AND THEN CROSS OVER THE OTHER 3 LANES TO THE RIGHT AND EXIT AT A DRIVE TO WHERE I WAS TRYING TO GET TO. I KNEW IT WAS GOING TO TAKE MAXIMUM ACCELERATION AND A DEFT TOUCH TO GET OVER THERE SAFELY. AS I TRIED TO DO THIS AND AS I MADE MY FIRST MOVE INTO THE LEFT LANE, MY CAR HESITATED AND DID NOT GIVE ME THE FULL ACCELERATION I WAS EXPECTING. THIS CAUSED ALL THE TIMING I NEEDED TO MAKE THIS MANEUVER SAFELY GO OUT THE WINDOW AND PUT ME IN A PRECARIOUS SITUATION. I HAD TO MAKE IN MY OPINION A VERY DANGEROUS MOVEMENT TO THE RIGHT TO AVOID A CAR THAT WAS CLOSING IN FAST FROM BEHIND BECAUSE I COULD NOT GET THE SPEED UP. THIS IS THE FIRST TIME THIS HAS HAPPENED ON THIS CAR. I WAS ABLE TO GET WHERE I WANTED TO GO BUT NOW HAVE NO CONFIDENCE IN THE RELIABILITY OF TRYING TO MAKE THIS MANEUVER AGAIN.[45]

91.    On April 12, 2019, a 2017 Acura MDX owner reported to NHTSA as follows:

DANGEROUS LOSS OF POWER WHILE ACCELERATING ON THE HIGHWAY! THERE HAVE BEEN THREE SEPARATE INCIDENCES OVER THE LAST 2 YEARS. WHILE I WAS TRYING TO ACCELERATE ON THE HIGHWAY, THE CAR SEVERELY LOST POWER AND THE "CHECK ENGINE" LIGHT STARTED FLASHING. THE CAR SEEMED TO OPERATE NORMALLY AFTER TURNING OFF AND ON THE ENGINE. THE DEALERSHIP CLAIMED THAT THERE WAS NO COMPUTER RECORDS OF PROBLEMS AFTER EACH INCIDENCE. ACURA JUST ISSUED A RECALL OF THE FUEL PUMP ON THIS MODEL YEAR MDX. HOWEVER, ACURA AND THE LOCAL ACURA DEALERSHIP REFUSED

---

[45] NHTSA ID No. 11160559.

- 36 -

THE REPAIR DUE TO THE LACK OF COMPUTER
RECORD OF FAILURE.[46]

92.    On August 6, 2019, a 2016 Acura TLX owner reported to NHTSA as follows:

TL* THE CONTACT OWNS A 2016 ACURA TLX. THE
CONTACT STATED THAT THE VEHICLE SUDDENLY
STALLED AND VARIOUS UNKNOWN INDICATORS
ILLUMINATED. THE VEHICLE WAS TAKEN TO
FRESNO ACURA (7250 N PALM AVE, FRESNO, CA
93711, (559) 431-3400) WHERE IT WAS DIAGNOSED
THAT THE FUEL PUMP FAILED. THE VEHICLE WAS
NOT REPAIRED AND THE MANUFACTURER WAS
NOT CONTACTED. THE FAILURE MILEAGE WAS
86,000.[47]

93.    On November 7, 2019, a 2016 Acura TLX owner reported to NHTSA as follows:

FROM A STOPPED POSITION, MOVING FORWARD
MY VEHICLE HESITATED AND DECREASED IN
POWER AND THE GAS PEDAL DID NOT HELP
MOVING THE VEHICLE FORWARD. THIS HAPPENED
IN THE MIDDLE OF THE INTERSECTION FOR
SEVERAL SECONDS 10-15 BEFORE THE VEHICLE
STARTED MOVING FORWARD AGAIN.[48]

94.    The above complaints are just a small subset of the complaints submitted to NHTSA for sudden stalls and pump failures in the Affected Vehicles. The safety implications are obvious, as illustrated by the events described above and Honda's eventual admission by its decision to issue a safety recall.

95.    It cannot reasonably be questioned that Honda is now, and was long before it first began selling Affected Vehicles, fully aware of the Fuel Pump Defect in the Affected Vehicles. Honda has acquired that knowledge through at least: (1) NHTSA complaints; (2) warranty claims; (3) non-warranty repair records;

---

[46] NHTSA ID No. 11195860.
[47] NHTSA ID No. 11242131.
[48] NHTSA ID No. 11278642.

- 37 -

(4) testing it claims to undertake in the development of new models; and (5) customer complaints to Honda and its dealers.

96.     Like all vehicle manufacturers, Honda monitors consumer reports and sentiments about its products that appear on social media, blogs, review sites, enthusiast sites, and other internet resources. Honda has toll-free numbers and email and other communication systems that are devoted to obtaining information (and complaints) from consumers about their products. Honda has certainly received numerous complaints about the Fuel Pump Defect in Affected Vehicles, as evidenced, in part, by the NHTSA complaints that expressly indicate contact with Honda directly and its dealers.

97.     Honda also receives technical information and reports from its dealers and service centers concerning warranty repairs, requests for warranty coverage, and safety complaints from vehicle owners.

98.     Vehicle manufacturers such as Honda have significant and dedicated departments which continuously monitor regulatory compliance with safety, emissions, customs, and tax laws. Their marketing departments monitor their competitors and public domain information to track emerging trends which may impact their business, such as the release of new competitive products or problems with commonly used components on other manufacturer's products. These departments maintain extensive databases of competitive information including design details, teardown analyses and reverse engineering to maintain their competitive edge or comparative advantage. These databases are searchable by employees and information is pushed to new product development teams.

99.     Specific departments in OEMs (including Product Compliance, Liability, and Environmental Management) will monitor many public (and subscription) sites such as truckandenginemanufacturers.org, NHTSA.gov, EPA.gov, the California Air Resources Board (ww2.arb.ca.gov), and international agencies (e.g., www.cen.eu,

ASTM.org) to ensure compliance with all standards, regulations and awareness of changing regulations, recalls, and safety-related issues, among others. They will also subscribe or fund firms to do this analysis and information gathering for them. They also employ lobbyists in government agencies to keep abreast of new situations. These firms are all well informed about market conditions and product liability potential issues.

100.   In addition, the federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[49]

101.   Emerging problems (such as the Fuel Pump Defect) would certainly be tracked by Honda and other OEMs. There are federal regulatory requirements mandating such tracking. Relevant information would then be condensed and pushed to design, development, testing, service and quality departments to ensure that they were aware of these emerging problems. These global firms maintain extensive bodies of knowledge such as "lessons learned" or "engineering standard work" databases to ensure that problems encountered internally or externally are codified into their own standards and disseminated to working levels of engineering, design, quality and service. "Lessons learned" from competitors are invaluable since they avoid similar problems during development and production. These "lessons learned" databases are particularly important when OEMs develop global products at multiple engineering centers around the world. "Lessons learned" and competitive benchmarking are key

---

[49] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

- 39 -

steps in the Design Validation Planning of all major OEMs and part of their "Value Analysis" studies for New Product Introduction.

102.   In addition, working level engineers and designers also are encouraged to join trade organizations such as the Society of Automotive Engineers, American Society of Mechanical Engineers, and ASTM, and to subscribe to many trade publications and tradeshows to stay current with changing requirements and competitive information. When a new product, regulation, standard, or issue is being announced or rumored, all major automotive news organizations will investigate and report on these developments since they are crucial for the OEMs' business. Product problems are also tracked closely since they affect stock market valuations and warranty accruals in SEC filings.

103.   Government organizations such as NHTSA, EPA, and CARB routinely push information to OEMs and require responses to ensure that they are on notice of emerging safety issues, recalls, emissions and safety compliance changes. This information is required to be published broadly by OEMs within their internal websites to employees to put them on notice, and there are compliance audits to ensure that employees are trained and certified where necessary.

104.   NTHSA recalls and investigations would certainly be communicated to the product development, quality, purchasing, and service teams.

105.   Accordingly, information about the Fuel Pump Defect would have been widely known throughout the industry, and certainly known to Honda.

**D.    Honda Sells, Markets, and Advertises Honda and Lexus Brand Vehicles as Safe and Reliable**

106.   Honda spends hundreds of millions of dollars on advertising and focuses that advertising intently on claims of safety and reliability. Honda knows and intends that consumers, including purchasers of Affected Vehicles, will buy their vehicles because they believe them to be safe and reliable.

- 40 -

107.   The image below is an example of Honda's consistent safety and reliability messaging:[50]





108.   Honda has consistently represented to Affected Vehicle owners that it remains committed to safety and security, as illustrated in the screenshots below:[51]

[50] https://www.honda.com/safety (last visited June 10, 2020).

[51] **2013:** http://web.archive.org/web/20130518073455/http://corporate.honda.com/safety/ (last visited June 10, 2020); **2015:** http://web.archive.org/web/20150322031420/http://corporate.honda.com/safety/ (last visited June 10, 2020); **2019:** http://web.archive.org/web/20191231113751/https://www.honda.com/safety (last visited June 10, 2020).

- 41 -



010928-12/1336608 V1

1

2

109.   Honda made similar representations throughout the class period. Below is a screenshot from a 2015 Honda Accord:[52]

3

4

5

6

7

8

9

10

11

12

13



14

110.   Below is a screenshot from a 2015 Honda Civic sales brochure:[53]

15

16

17

18

19

20

21

22

23

24

25

26

[52] https://cdn.dealereprocess.net/cdn/brochures/honda/2015-accord.pdf (last visited June 10, 2020).

27

[53] https://cdn.dealereprocess.net/cdn/brochures/honda/2015-civic.pdf (last visited June 10, 2020).

28

- 43 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    111.    Below is a screenshot from a 2015 Acura MDX sales brochure:[54]

16



17
18
19
20
21
22
23
24
25
26
27

<hr />

[54] https://cdn.dealereprocess.org/cdn/brochures/acura/2015-mdx.pdf (last visited June 10, 2020).

28

- 44 -

112. Below is a screenshot of a 2018 Honda Accord sales brochure:[55]



113. Below is a screenshot of a 2018 Acura MDX sales brochure:[56]



_____

[55] https://automobiles.honda.com/-/media/Honda-Automobiles/Vehicles/2018/
Accord-Sedan/brochure/MY18-Accord-Brochure-Model-Site.pdf (last visited June 10,
2020).

[56] https://cdn.dealereprocess.org/cdn/brochures/acura/2018-mdx.pdf (last visited
June 10, 2020).

- 45 -

114.   As demonstrated, Honda employed and continues to employ a long term and uniform marketing message that its vehicles are of the utmost safety and dependability, without ever disclosing the Fuel Pump Defect.

**E.     Plaintiffs and Class Members Would Not Have Purchased or Leased, or Would Have Paid Less for, Affected Vehicles Had They Known of the Fuel Pump Defect**

115.   No owner or lessee of an Affected Vehicle would have purchased their vehicle, or at least would have paid less for their Affected Vehicle, had they known that the fuel delivery system might unexpectedly fail, or had they known that Honda would fail to fix a known defect in the low-pressure fuel pump.

116.   As a result of the Fuel Pump Defect in Affected Vehicles and the costs of repairs required to ameliorate it, Plaintiff and all owners of Affected Vehicles (the "Class") have suffered injury in fact, incurred damages, and have suffered harm as a result of Honda's acts and omissions. Plaintiffs and Class members seek remedies under the consumer protection statutes of the states in which they reside, and also seek recovery for Honda's breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and fraudulent concealment.

117.   Plaintiffs and each Class member suffered injury as they purchased their Affected Vehicle under the express and implied warranties that their vehicles would operate safely throughout the useful life of such vehicles. A vehicle containing the Fuel Pump Defect does not operate as warranted and for its intended purpose because it does not operate safely or reliably. In addition, an Affected Vehicle is worth less than a correctly operating/non-faulty Affected Vehicle.

**F.     Honda Has Manipulated Its Warranty to Minimize Its Obligation to Fix the Fuel Pump Defect in Affected Vehicles**

118.   In connection with the sale of new vehicles, including the Affected Vehicles, Honda provides a New Vehicle Limited Warranty ("NVLW") for the lesser of three years or 36,000 miles. Its powertrain warranty is for five years, or 60,000 miles, whichever comes first.

- 46 -

119.   The NVLW states:

> Your vehicle is covered for 3 years or 36,000 miles, whichever comes first. Some parts may have separate coverage under other warranties described in this book. Warranty Coverage Honda will repair or replace any part that is defective in material or workmanship under normal use. See Proper Operation on page 35.

> All repairs/replacements made under this warranty are free of charge. The replaced or repaired parts are covered only until this New Vehicle Limited Warranty expires.

120.   For the Acura-branded Affected Vehicles, Honda offered a written express Limited Warranty of four years or 50,000 miles. Honda also offered a six-year 70,000-mile powertrain warranty.

121.   In order to obtain repairs under the NVLW, owners and lessees of covered vehicles are told by Honda to present their vehicles to certified Honda service centers, which are generally housed at Honda dealerships.

122.   Honda is not honoring the plain language of its warranty agreement. Even when owners of Affected Vehicles have presented their cars to Honda service centers and complained of issues traceable to the Fuel Pump Defect, Honda has: (1) failed to notify them of the Fuel Pump Defect in their Affected Vehicles; and/or (2) notified them of the recall associated with the Fuel Pump Defect, but refused to repair the defect or provide alternative/replacement transportation that is not defective. Likewise, Affected Vehicle owners who do not complain of issues relating to the Fuel Pump Defect are never informed of the Fuel Pump Defect in Affected Vehicles, and are never offered a repair. Honda has also failed to notify Affected Vehicle owners of the 2020 recall.

G.   **Allegations Establishing Agency Relationship Between Manufacturer Honda and Honda Dealerships.**

123.   Upon information and belief, Honda impliedly or expressly acknowledged that Honda-authorized dealerships are its sales agents, the dealers have

- 47 -

accepted that undertaking, Honda has the ability to control authorized Honda dealers, and Honda acts as the principal in that relationship, as is shown by the following:

  i. Manufacturer Honda can terminate the relationship with its dealers at will;

  ii. The relationships are indefinite;

  iii. Manufacturer Honda is in the business of selling vehicles as are its dealers;

  iv. Manufacturer Honda provides tools and resources for Honda dealers to sell vehicles;

  v. Manufacturer Honda supervises its dealers regularly;

  vi. Without Manufacturer Honda, the relevant Honda dealers would not exist;

  vii. Manufacturer Honda requires the following of its dealers:

    a. Reporting of sales;

    b. Computer network connection with Manufacturer Honda;

    c. Training of dealers' sales and technical personnel;

    d. Use of Manufacturer Honda-supplied computer software;

    e. Participation in Manufacturer Honda's training programs;

    f. Establishment and maintenance of service departments in Honda dealerships;

    g. Certify Honda pre-owned vehicles;

    h. Reporting to Manufacturer Honda with respect to the vehicle delivery, including reporting Class members' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

    i. Displaying Manufacturer Honda logos on signs, literature, products, and brochures within Honda dealerships.

  viii. Dealerships bind Manufacturer Honda with respect to:

- 48 -

a.    Warranty repairs on the vehicles the dealers sell; and

b.    Issuing service contracts administered by Manufacturer Honda.

ix.    Manufacturer Honda further exercises control over its dealers with respect to:

a.    Financial incentives given to Honda dealer employees;

b.    Locations of dealers;

c.    Testing and certification of dealership personnel to ensure compliance with Manufacturer Honda's policies and procedures; and

d.    Customer satisfaction surveys, pursuant to which Manufacturer Honda allocates the number of Honda cars to each dealer, thereby directly controlling dealership profits.

x.    Honda dealers sell Honda vehicles on Manufacturer Honda's behalf, pursuant to a "floor plan," and Manufacturer Honda does not receive payment for its cars until the dealerships sell them.

xi.    Dealerships bear Honda's brand names, use Honda's logos in advertising and on warranty repair orders, post Honda-brand signs for the public to see, and enjoy a franchise to sell Manufacturer Honda's products, including the Affected Vehicles.

xii.    Manufacturer Honda requires Honda dealers to follow the rules and policies of Manufacturer Honda in conducting all aspects of dealer business, including the delivery of Manufacturer Honda's warranties described above, and the servicing of defective vehicles such as the Affected Vehicles.

xiii.    Manufacturer Honda requires its dealers to post Honda's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Honda dealers and servicing outlets for Manufacturer Honda cars.

xiv.    Manufacturer Honda requires its dealers to use service and repair forms containing Manufacturer Honda's brand names and logos.

xv.    Manufacturer Honda requires Honda dealers to perform Manufacturer Honda's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer Honda.

- 49 -

xvi.    Manufacturer Honda requires Honda dealers to use parts and tools either provided by Manufacturer Honda, or approved by Manufacturer Honda, and to inform Honda when dealers discover that unauthorized parts have been installed on one of Manufacturer Honda's vehicles.

xvii.   Manufacturer Honda requires dealers' service and repair employees to be trained by Honda in the methods of repair of Honda-brand vehicles.

xviii.  Manufacturer Honda audits Honda dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.    Manufacturer Honda requires its dealers to provide Honda with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer Honda's vehicles.

xx.     Manufacturer Honda provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.    Manufacturer Honda provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer Honda to consult when dealers are unable to correct a vehicle defect on their own.

xxii.   Manufacturer Honda requires Honda-brand vehicle owners to go to authorized Honda dealers to obtain servicing under Honda warranties; and

xxiii.  Honda dealers are required to notify Manufacturer Honda whenever a car is sold or put into warranty service.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

124.    Class members had no way of knowing about Honda's deception with respect to the Fuel Pump Defect in the Affected Vehicles.

125.    Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Honda was concealing the Fuel Pump Defect in the

- 50 -

Affected Vehicles and misrepresenting the safety, quality, and reliability of the Affected Vehicles.

126.   Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Honda did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Honda had concealed information about the true nature of the Fuel Pump Defect in the Affected Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiffs and other Class members have disclosed that Honda valued profits over the safety of its customers, their friends and family, and innocent bystanders.

127.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims asserted herein.

**B.    Fraudulent Concealment Tolling**

128.   All applicable statutes of limitation have also been tolled by Honda's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

129.   Instead of disclosing the existence of the Fuel Pump Defect, Honda falsely represented that the Affected Vehicles were safe, dependable, reliable, and of high quality.

**C.    Estoppel**

130.   Honda was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fuel delivery system in the Affected Vehicles.

131.   Honda knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fuel delivery system in the Affected Vehicles.

- 51 -

132.    Based on the foregoing, Honda is estopped from relying on any statutes of limitations in defense of this action.

## VII.    CHOICE OF LAW ALLEGATIONS

133.    Because this Complaint is brought in California, California's choice of law regime governs the state law allegations in this Complaint. Under California's choice of law rules, California law applies to the claims of all Class members, regardless of their state of residence or state of purchase.

134.    Because Honda is headquartered in California, and made all decisions related to these claims in this State, California has a substantial connection to, and materially greater interest in, the rights, interests, and policies involved in this action compared to any other state. Application of California law to Honda and the claims of all Class members would accordingly not be arbitrary or unfair.

## VIII.  CLASS ALLEGATIONS

135.    Plaintiffs brings this action on behalf of themselves and as a class action pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses (collectively, the "Classes"):

**The Nationwide Class**

> All persons or entities in the United States who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles.

**The Florida Subclass**

> All persons or entities in the state of Florida who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles.

- 52 -

**The California Subclass**

> All persons or entities in the state of California who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles

**The Kentucky Subclass**

> All persons or entities in the state of Kentucky who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles

**The Indiana Subclass**

> All persons or entities in the state of Indiana who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles

**The Virginia Subclass**

> All persons or entities in the state of Virginia who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles

**The Pennsylvania Subclass**

> All persons or entities in the state of Pennsylvania who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles

**The New York Subclass**

> All persons or entities in the state of New York who owned and/or leased an Acura or Honda vehicle with the Denso fuel pump with the part number prefix 17045-, including but not limited to the 2019 Recalled Vehicles and the 2020 Recalled Vehicles

- 53 -

136.  Excluded from the Class are individuals who have personal injury claims resulting from the fuel delivery system in the Affected Vehicles. Also excluded from the Class is Honda and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

137.  Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

138.  This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

139.  **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe—based on publicly available sales data for the Affected Vehicles—that there are millions of members of the Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Honda's books and records, as well as the recall reports that Honda has submitted to NHTSA. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

140.  **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a.  Whether Honda engaged in the conduct alleged herein;

- 54 -

b.    Whether Honda designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Affected Vehicles into the stream of commerce in the United States;

c.    Whether the Affected Vehicles contain a defect in their fuel delivery system and if so, whether it is a safety defect;

d.    Whether Honda knew about the defect in the fuel delivery system of the Affected Vehicles and, if so, how long Honda has known;

e.    When Honda discovered the Fuel Pump Defect in the Affected Vehicles, and what, if anything, they did in response;

f.    Whether Honda has sought to minimize their warranty expenses by refusing to repair the Fuel Pump Defect in the Affected Vehicles;

g.    Whether Honda's breach of contract and fraudulent concealment as asserted herein;

h.    Whether Plaintiffs and the other Class members overpaid for their Affected Vehicles;

i.    Whether Plaintiffs experienced out-of-pocket losses from replacing parts as a result of the Fuel Pump Defect, and if so, how much; and

j.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

141.    **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Honda's wrongful conduct as described above.

142.    **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

- 55 -

143.   **Declaratory Relief**: Federal Rule of Civil Procedure 23(b)(2): Honda has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

144.   **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Honda, so it would be impracticable for the members of the Classes to individually seek redress for Honda's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

A.     **Claims Brought on Behalf of the Nationwide Class**

**COUNT I**

**FRAUDULENT CONCEALMENT
(BASED ON COMMON LAW)**

145.   Plaintiffs restate and reallege, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

146.   Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

147.   Honda intentionally concealed that the Affected Vehicles are defective.

148.   Honda further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided

- 56 -

with each Affected Vehicle and on its website, that the Affected Vehicles it was selling had no significant defects, that the Affected Vehicles were safe, reliable, and of high quality, and would perform and operate in a safe manner.

149.   Honda knew about the defect in the Affected Vehicles when these representations were made.

150.   The Affected Vehicles purchased by Plaintiffs and the other Class members contained defective fuel delivery systems.

151.   Honda had a duty to disclose that the Affected Vehicles contained a fundamental defect as alleged herein, because Plaintiffs and the other Class members relied on Honda's material representations.

152.   As alleged herein, at all relevant times, Honda has held out the Affected Vehicles to be free from defects such as the Fuel Pump Defect. Honda touted and continue to tout the many benefits and advantages of the Affected Vehicles, but nonetheless failed to disclose important facts related to the defect. This made Honda's other disclosures about the Affected Vehicles deceptive.

153.   The truth about the defective Affected Vehicles was known only to Honda; Plaintiffs and the other Class members did not know of these facts and Honda actively concealed these facts from Plaintiffs and Class members.

154.   Plaintiffs and the other Class members reasonably relied upon Honda's deception. They had no way of knowing that Honda's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own. Rather, Honda intended to deceive Plaintiffs and Class members by concealing the true facts about the Affected Vehicles.

155.   Honda's false representations and omissions were material to consumers because they concerned safety of the Affected Vehicle, which played a significant role in the value of the Affected Vehicle.

- 57 -

156.   Honda had a duty to disclose the Fuel Pump Defect and violations with respect to the Affected Vehicle because they concerned the safety of the Affected Vehicles, the details of the true facts were known and/or accessible only to Honda, because Honda had exclusive knowledge as to such facts, and because Honda knew these facts were not known to or reasonably discoverable by Plaintiffs or Class members.

157.   Honda also had a duty to disclose because it made general affirmative representations about the safety and reliability of the Affected Vehicles, without telling consumers that the Affected Vehicles had a fundamental system defect that would affect the safety, quality, and reliability of the Affected Vehicle.

158.   Honda's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the Fuel Pump Defect as set forth herein. These omitted and concealed facts were material because they directly impact the safety and value of the Affected Vehicles purchased by Plaintiffs and Class members.

159.   Honda has still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding the defect in the Affected Vehicles.

160.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for the Affected Vehicles with the Fuel Pump Defect, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Honda were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Class members.

- 58 -

161.   Because of the concealment and/or suppression of facts, Plaintiffs and Class members sustained damage because they own Affected Vehicles that are diminished in value as a result of Honda's concealment of the true safety and quality of the Affected Vehicles. Had Plaintiffs and Class members been aware of the Fuel Pump Defect, and Honda's disregard for the truth, Plaintiffs and Class members would have paid less for their Affected Vehicles or would not have purchased them at all.

162.   The value of Plaintiffs' and Class members' Affected Vehicles have diminished as a result of Honda's fraudulent concealment of the Fuel Pump Defect, which has made any reasonable consumer reluctant to purchase an Affected Vehicle, let alone pay what otherwise would have been fair market value for the Affected Vehicle.

163.   Accordingly, Honda is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

164.   Honda's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Honda made to them, in order to enrich Honda. Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON COMMON LAW)

165.   Plaintiffs restate and reallege, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows.

166.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

167.   Honda's misrepresentations and omissions alleged herein, including but not limited to, Honda's concealment and suppression of material facts concerning the

- 59 -

Affected Vehicles, including the reliability and durability of the fuel delivery system, caused Plaintiffs and the other Class members to make their purchases or leases of their Affected Vehicles.

168.   Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Affected Vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased different vehicles that did not contain the Defective Fuel Pump. Accordingly, Plaintiffs and other Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

169.   Each and every sale or lease of an Affected Vehicle constitutes a contract between Honda and the purchaser or lessee. Honda breached these contracts by selling or leasing to Plaintiffs and the other Class members defective Affected Vehicle and by misrepresenting or failing to disclose material facts concerning the safety, durability, performance, and quality of the Affected Vehicles.

170.   As a direct and proximate result of Honda's breach of contract, Plaintiffs and other Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**B.     Claims Brought on Behalf of the Nationwide Class, or Alternatively on Behalf of a California Subclass**

### COUNT III

### VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ.*)

171.   Plaintiff Nina Tepirdzhyan (for purposes of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

172.   Plaintiff brings this claim on behalf of herself and the Nationwide Class. Plaintiff alternatively brings this claim on behalf of a California Subclass.

- 60 -

173.   California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

174.   The Affected Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

175.   Plaintiff and the other Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiff, the other Class members, and Honda are "persons" as defined in Cal. Civ. Code § 1761(c).

176.   As alleged herein, Honda made misleading representations and omissions concerning the benefits, performance, and reliability of the Affected Vehicles.

177.   In purchasing the Affected Vehicles, Plaintiff and other Class members were deceived by Honda's failure to disclose its knowledge of the defect in the Affected Vehicles.

178.   Honda's conduct as described herein was and is in violation of the CLRA. Honda's conduct violates at least the following enumerated CLRA provisions:

i.   Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have.

ii.   Cal Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade if they are of another.

iii.   Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

iv.   Cal Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

- 61 -

179.    Honda intentionally and knowingly misrepresented and omitted material facts regarding the Affected Vehicles, specifically regarding the Fuel Pump Defect, and its misrepresentations that the Affected Vehicles were safe, reliable, and of high quality, and would operate and perform in a safe manner.

180.    In purchasing the Affected Vehicles, Plaintiff and other Class members were deceived by Honda's failure to disclose its knowledge of Fuel Pump Defect.

181.    Plaintiff and other Class members had no way of knowing Honda's representations were false, misleading, and incomplete or knowing the true nature of the Affected Vehicles.

182.    As alleged herein, Honda engaged in a pattern of deception and public silence in the face of a known defect with its Affected Vehicles. Plaintiff and other Class members did not, and could not, unravel Honda's deception on their own.

183.    Honda knew or should have known its conduct violated the CLRA.

184.    Honda owed Plaintiff and the Class members a duty to disclose the truth about its faulty Affected Vehicles because Honda:

       i.     Possessed exclusive knowledge of the defect in the Affected Vehicles;

      ii.     Intentionally concealed the foregoing from Plaintiff and Class members; and/or

     iii.     Made incomplete representations in advertisements and on its website, failing to warn the public or to publicly admit that the Affected Vehicles was defective.

185.    Honda had a duty to disclose that the Affected Vehicles contained a defective Denso pump, because Plaintiff and the other Class members relied on Honda's material misrepresentations and omissions regarding the features of the Affected Vehicles.

- 62 -

186.  Honda's conduct proximately caused injuries to Plaintiff and the other Class members that purchased the Affected Vehicles and suffered harm as alleged herein.

187.  Plaintiff and the other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other Class members incurred costs, including overpaying for their Affected Vehicles that have suffered a diminution in value.

188.  Honda's violations cause continuing injuries to Plaintiff and other Class members.

189.  Honda's unlawful acts and practices complained of herein affect the public interest.

190.  Honda fully knew about the Fuel Pump Defect, and that the Affected Vehicles was materially compromised by such defects.

191.  The facts concealed and omitted by Honda from Plaintiff and other Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase an Affected Vehicle or pay a lower price. Had Plaintiff and the other Class members known about the defective nature of the Affected Vehicles, they would not have purchased the Affected Vehicles or would not have paid the prices they paid.

192.  Plaintiff's and the other Class members' injuries were proximately caused by Honda's unlawful and deceptive business practices.

193.  Pursuant to Cal. Civ. Code § 1780(a), Plaintiff seeks an order enjoining Honda from engaging in the methods, acts, or practices alleged herein, including further concealment of the defect in the Affected Vehicles.

194.  Plaintiff sent out a notice letter on June 10, 2020.

195.    Honda has not rectified its conduct within 30 days, and accordingly Plaintiff request the following forms of relief pursuant to Cal. Civ. Code § 1782:

    i.    Actual damages;

    ii.    Restitution of money to Plaintiff and Class members, and the general public;

    iii.    Punitive damages;

    iv.    An additional award of up to $5,000 to each Plaintiff and any Class member who is a "senior citizen";

    v.    Attorneys' fees and costs; and

    vi.    Other relief that this Court deems proper.

**COUNT IV**

**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)**

196.    Plaintiff Nina Tepirdzhyan (for purposes of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

197.    Plaintiff brings this claim on behalf of herself and the Nationwide Class. Plaintiff alternatively brings this claim on behalf of a California Subclass.

198.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising."

199.    Honda's conduct, as described herein, was and is in violation of the UCL. Honda's conduct violates the UCL in at least the following ways:

    i.    By failing to disclose the Fuel Pump Defect in the Affected Vehicles;

    ii.    By selling Affected Vehicles s that suffer from such defects;

    iii.    By knowingly and intentionally concealing from Plaintiff and the other Class members that the Affected Vehicles was defective;

- 64 -

iv.   By marketing Affected Vehicles as safe, reliable, and of high quality, and would perform and operate in a safe manner; and

v.   By violating other California laws, including California consumer protection laws.

200.   Honda intentionally and knowingly misrepresented and omitted material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the other Class members.

201.   In purchasing the Affected Vehicles, Plaintiff and the other Class members were deceived by Honda's failure to disclose the Fuel Pump Defect.

202.   Plaintiff and the other Class members reasonably relied upon Honda's false misrepresentations and omissions. They had no way of knowing that Honda's representations were false, misleading, and incomplete. As alleged herein, Honda engaged in a pattern of deception and public silence in the face of a known defect with its Affected Vehicles. Plaintiff and the other Class members did not, and could not, unravel Honda's deception on their own.

203.   Honda knew or should have known that its conduct violated the UCL.

204.   Honda owed Plaintiff and the other Class members a duty to disclose the truth about its Affected Vehicles because Honda:

i.   Possessed exclusive knowledge of the defect in the Affected Vehicles;

ii.   Intentionally concealed the foregoing from Plaintiff and the other Class members; and/or

iii.   Made incomplete representations by failing to warn the public or to publicly admit that the Affected Vehicles was defective.

205.   Honda had a duty to disclose that the Affected Vehicles were fundamentally flawed as described herein, because Plaintiff and the other Class members relied on Honda's material misrepresentations and omissions.

- 65 -

206.  Honda's conduct proximately caused injuries to Plaintiff and the other Class members that purchased the Affected Vehicles and suffered harm as alleged herein.

207.  Plaintiff and the other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other Class members incurred costs, including overpaying for their Affected Vehicles that have suffered a diminution in value.

208.  Honda's violations cause continuing injuries to Plaintiff and Class members.

209.  Honda's unlawful acts and practices complained of herein affect the public interest.

210.  Honda's misrepresentations and omissions alleged herein caused Plaintiff and the other Class members to make their purchases of their Affected Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased Affected Vehicles, would not have purchased the Affected Vehicles at the prices they paid, and/or would have purchased alternative vehicles that did not contain the Fuel Pump Defect because the Affected Vehicles failed to live up to reasonable consumer expectations and industry standards.

211.  Accordingly, Plaintiff and the other Class members have suffered injury-in-fact, including lost money or property, as a result of Honda's misrepresentations and omissions.

212.  Plaintiff requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and Class members any money Honda acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other relief as may be appropriate.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. COM. CODE § 2314)

213.   Plaintiff Nina Tepirdzhyan (for purposes of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

214.   Plaintiff brings this claim on behalf of herself and the Nationwide Class. Plaintiff alternatively brings this claim on behalf of a California Subclass.

215.   Honda is and was at all relevant times a merchant with respect to the Affected Vehicles under Cal. Com. Code § 2104.

216.   A warranty that the Affected Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

217.   Honda marketed the Affected Vehicles as safe, reliable, and of high quality that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Class members' decisions to purchase the Affected Vehicles.

218.   Plaintiff and other Class members purchased the Affected Vehicles from Honda, or through Honda's authorized agents for retail sales. At all relevant times, Honda was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

219.   Honda knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

220.   Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

221.   Honda knew about the defect in the Affected Vehicles, allowing Honda to cure its breach of its warranty if it chose.

222.   Honda's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.

- 67 -

Specifically, Honda's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Fuel Pump Defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class members. Among other things, Plaintiff and other Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and other Class members, and Honda knew of the defect at the time of sale.

223.   Plaintiff and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Honda's conduct described herein. Affording Honda a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

224.   Accordingly, Honda is liable to Plaintiff and Class members for damages in an amount to be proven at trial.

**C.     Claims Brought on Behalf of the Florida Subclass**

**COUNT VI**

**VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") (FLA. STAT. ANN. § 501.201, *ET SEQ.*)**

225.   Plaintiff Nathaniel Booker ("Plaintiff," for purposes of the Florida Subclass Counts) restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein.

226.   Plaintiff brings this Count on behalf of himself and all similarly situated residents of the state of Florida for violations of Florida's Deceptive and Unfair Trade Practices Act.

227.   Plaintiff and other Florida Subclass members who purchased their vehicles new are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.203(7).

- 68 -

228.   Honda engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

229.   The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204(1). Honda participated in unfair and deceptive trade practices that violated the FDUTPA as described herein. In the course of its business, Honda concealed and suppressed material facts concerning the Fuel Pump Defect. Honda falsely represented the quality of the Affected Vehicles and omitted material facts regarding the fuel pump, as well as the durability and overall value of the Affected Vehicles, for the purpose of inducing Plaintiff and other Florida Subclass members to purchase the Affected Vehicles, and to increase Honda's revenue and profits.

230.   The facts concealed and omitted by Honda were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Florida Subclass members known of the Fuel Pump Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

231.   Honda's conduct proximately caused injuries to Plaintiff and the other Florida Subclass members.

232.   Plaintiff and the other Florida Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other Florida Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Honda's misrepresentations, fraud, deceptive practices, and omissions.

233.   Honda's violations present a continuing risk to Plaintiff as well as to the general public. Honda's unlawful acts and practices complained of herein affect the public interest.

234.   Accordingly, Honda is liable to Plaintiff and the other Florida Subclass members for damages in an amount to be proven at trial.

**COUNT VII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(FLA. STAT. ANN. §§ 672.314 AND 680.212)**

235.   Plaintiff Nathaniel Booker (for purposes of this section, "Plaintiff") restates and realleges, and incorporates herein by reference, the preceding paragraphs as if fully set forth herein and further alleges as follows:

236.   Plaintiff brings this Count on behalf of himself and all other similarly situated residents of the state of Florida for violations of implied warranty of merchantability under Florida law.

237.   Honda was at all times a "merchant" with respect to motor vehicles under Fla. Stat. Ann. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

238.   With respect to leases, Honda is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. Ann. § 680.1031(1)(p).

239.   The Affected Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. Ann. §§ 672.105(1) and 680.1031(1)(h).

240.   A warranty that the Affected Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Fla. Stat. Ann. §§ 672.314 and 680.212.

241.   The Affected Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

242.   Honda marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in

- 70 -

accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Florida Subclass members' decisions to purchase the Affected Vehicles.

243.   Plaintiff and other Florida Subclass members purchased the Affected Vehicles from Honda, or through Honda's authorized agents for retail sales. At all relevant times, Honda was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

244.   Honda knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

245.   Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

246.   Honda knew about the defect in the Affected Vehicles, allowing Honda to cure their breach of warranty if it chose to do so.

247.   Honda's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Honda's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Florida Subclass members. Among other things, Plaintiff and other Florida Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Florida Subclass members, and Honda knew of the defect at the time of sale.

248.   Plaintiff and Florida Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Honda's conduct described herein. Affording Honda a

- 71 -

reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

249.    Honda was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

250.    Accordingly, Honda is liable to Plaintiff and Florida Subclass members for damages in an amount to be proven at trial.

## COUNT VIII

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (BASED ON FLORIDA STATE LAW)

251.    Plaintiff Nathaniel Booker (for purposes of this section, "Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

252.    Plaintiff brings this Count on behalf of himself and all similarly situated residents of the state of Florida.

253.    Plaintiff and Florida Subclass members entered into contracts with Honda in connection with the sale of the Affected Vehicles.

254.    Plaintiff and Florida Subclass members gave fair and reasonable consideration and performed all their material obligations under the contracts.

255.    Implied in all contracts is a covenant of good faith and fair dealing, imposing a duty on the parties to act in good faith and deal fairly with one another.

256.    Plaintiff and Florida Subclass members had a reasonable expectation that when they purchased their Affected Vehicles from Honda, the Affected Vehicles would be free of defects, especially defects that affected the safety and operability of the Affected Vehicles.

257.    Honda made the decision to place inferior low-pressure fuel pumps into the Affected Vehicles without informing Plaintiff and Florida Subclass members that the inferior technology would create a safety defect in the Affected Vehicles.

258.    Plaintiff and Florida Subclass members had no reason to know Honda had placed inferior low-pressure fuel pumps into the Affected Vehicles.

- 72 -

259.   By creating and promoting an automobile with a latent safety defect, Honda breached the covenant of good faith and fair dealing and breached its contractual duty to Plaintiff and Florida Subclass members.

260.   As a direct and proximate result of Honda's breach, Plaintiff and Florida Subclass members suffered damages, including being induced to purchase the defective Affected Vehicles.

**COUNT IX**
**UNJUST ENRICHMENT**

261.   Plaintiff incorporates all paragraphs as though fully set forth herein.

262.   Plaintiff brings this claim on behalf of himself and members of the Florida Subclass (collectively, "Plaintiffs").

263.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

264.   Honda has received and retained a benefit from Plaintiffs and inequity has resulted.

265.   Honda has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of Honda's conduct, at a profit, and Plaintiffs have overpaid for the Affected Vehicles and been forced to pay other costs.

266.   Thus, all Plaintiffs conferred a benefit on Honda.

267.   It is inequitable for Honda to retain these benefits.

268.   Plaintiffs were not aware of the true facts about the Affected Vehicles and did not benefit from Honda's conduct.

269.   Honda knowingly accepted the benefits of its unjust conduct.

270.   As a result of Honda's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

- 73 -

1

**D.    Claims Brought on Behalf of a Kentucky Subclass**

2

**COUNT X**

3

**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. ANN. § 367.110 *ET SEQ.*)**

4

5

271.    Plaintiff Justin Foust (for purposes of the Kentucky Subclass Counts, "Plaintiff") incorporates by reference all paragraphs as though fully set forth herein.

6

7

272.    Plaintiff brings this Count on behalf of the members of the Kentucky Subclass.

8

9

273.    Honda, Plaintiff, and other Class members are a "person" within the meaning of the Ky. Rev. Stat. Ann. § 367.110(1).

10

11

274.    Honda engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

12

13

275.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170(1). Honda participated in misleading, false, or deceptive acts that violated the Kentucky CPA. Accordingly, Honda engaged in deceptive business practices prohibited by the Kentucky CPA.

14

15

16

17

276.    The facts concealed and omitted by Honda were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Kentucky Subclass members known of the Fuel Pump Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

18

19

20

21

22

23

277.    Honda's conduct proximately caused injuries to Plaintiff and the other Kentucky Subclass members.

24

25

278.    Plaintiff and the other Kentucky Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other Kentucky Subclass members

26

27

28

- 74 -

overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Honda's misrepresentations, fraud, deceptive practices, and omissions.

279.  Honda's violations present a continuing risk to Plaintiff as well as to the general public. Honda's unlawful acts and practices complained of herein affect the public interest.

280.  Accordingly, Honda is liable to Plaintiff and the other Kentucky Subclass members for damages in an amount to be proven at trial.

281.  Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiff and the Kentucky Subclass seek to recover actual damages in an amount to be determined at trial; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

**E.    Claims Brought on Behalf of an Indiana Subclass**

**COUNT XI**
**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**(IND. CODE § 24-5-0.5-3)**

282.  Plaintiff Justin Foust (for purposes of all Indiana Class Counts) incorporates by reference all paragraphs as though fully set forth herein.

283.  Plaintiff brings this Count on behalf of himself and members of the Indiana Subclass.

284.  Honda is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2).

285.  Plaintiff's and Indiana Subclass members' purchases and leases of the Affected Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

286.  Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person or supplier from engaging in "an unfair, abusive or deceptive act, or omission, or practice in connection with a consumer transaction." "Deceptive acts" include: "(1)

- 75 -

1   That such subject of a consumer transaction has sponsorship, approval, performance,

2   characteristics, accessories, uses, or benefits it does not have which the supplier knows

3   or should reasonably know it does not have; (2) That such subject of a consumer

4   transaction is of a particular standard, quality, grade, style, or model, if it is not and if

5   the supplier knows or should reasonably know that it is not: . . . (c) Any

6   representations on or within a product or its packaging or in advertising or

7   promotional materials which would constitute a deceptive act shall be the deceptive

8   act both of the supplier who places such a representation thereon or therein, or who

9   authored such materials, and such suppliers who shall state orally or in writing that

10  such representation is true if such other supplier shall know or have reason to know

11  that such representation was false." Ind. Code § 24-5-0.5-3.

12      287.   The facts concealed and omitted by Honda were material in that a

13  reasonable consumer would have considered them to be important in deciding whether

14  to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and

15  other Indiana Subclass members known of the Fuel Pump Defect, they would not have

16  purchased or leased those vehicles, or would have paid substantially less for the

17  vehicles than they did.

18      288.   Honda's conduct proximately caused injuries to Plaintiff and the other

19  Indiana Subclass members.

20      289.   Plaintiff and the other Indiana Subclass members were injured and

21  suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result

22  of Honda's conduct in that Plaintiff and the other Indiana Subclass members overpaid

23  for their Affected Vehicles and did not receive the benefit of their bargain, and their

24  Affected Vehicles have suffered a diminution in value. These injuries are the direct

25  and natural consequence of Honda's misrepresentations, fraud, deceptive practices,

26  and omissions.

27

28

290.   Honda's violations present a continuing risk to Plaintiff as well as to the general public. Honda's unlawful acts and practices complained of herein affect the public interest.

291.   Accordingly, Honda is liable to Plaintiff and the other Indiana Subclass members for damages in an amount to be proven at trial.

292.   Pursuant to Ind. Code § 24-5-0.5-4, the Indiana Subclass members are entitled to monetary relief from Honda measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 for each Indiana Subclass member, including treble damages up to $1,000 for Honda's willfully deceptive acts.

293.   The Indiana Subclass members also seek punitive damages based on the outrageousness and recklessness of Honda's conduct and Honda's high net worth.

294.   These allegations shall serve as written notice to Honda pursuant to Ind. Code § 24-5-0.5-5(a), which are served on Honda within six months after the initial discovery of the deceptive act.

**COUNT XII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(IND. CODE § 26-1-2-314)**

295.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

296.   Plaintiff brings this Count on behalf of the Indiana Subclass members.

297.   Honda is a merchant with respect to motor vehicles within the meaning of the Ind. Code § 26-1-2-314.

298.   Under Ind. Code § 26-1-2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and Indiana Subclass members purchased or leased their Affected Vehicles from Honda.

- 77 -

299.   The Affected Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

300.   Honda marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Indiana Subclass members' decisions to purchase the Affected Vehicles.

301.   Plaintiff and other Indiana Subclass members purchased the Affected Vehicles from Honda, or through Honda's authorized agents for retail sales. At all relevant times, Honda was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

302.   Honda knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

303.   Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

304.   Honda knew about the defect in the Affected Vehicles, allowing Honda to cure their breach of warranty if it chose to do so.

305.   Honda's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Honda's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Indiana Subclass members. Among other things, Plaintiff and other Indiana Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A

- 78 -

gross disparity in bargaining power existed between Honda and Indiana Subclass members, and Honda knew of the defect at the time of sale.

306.   Plaintiff and Indiana Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Honda's conduct described herein. Affording Honda a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

307.   Honda was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

308.   Accordingly, Honda is liable to Plaintiff and Indiana Subclass members for damages in an amount to be proven at trial.

**COUNT XIII**
**UNJUST ENRICHMENT**

309.   Plaintiff incorporates all paragraphs as though fully set forth herein.

310.   Plaintiff brings this claim on behalf of himself and members of the Indiana Subclass (collectively, "Plaintiffs").

311.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

312.   Honda has received and retained a benefit from Plaintiffs and inequity has resulted.

313.   Honda has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of Honda's conduct, at a profit, and Plaintiffs have overpaid for the Affected Vehicles and been forced to pay other costs.

314.   Thus, all Plaintiffs conferred a benefit on Honda.

315.   It is inequitable for Honda to retain these benefits.

316.   Plaintiffs were not aware of the true facts about the Affected Vehicles and did not benefit from Honda's conduct.

317.   Honda knowingly accepted the benefits of its unjust conduct.

- 79 -

318.    As a result of Honda's conduct, the amount of its unjust enrichment

should be determined in an amount according to proof.

**F.    Claims Brought on Behalf of a Virginia Subclass**

**COUNT XIV**
**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(VA. CODE ANN. § 59.1-196 *ET SEQ.*)**

319.    Plaintiff Jay Patel ("Plaintiff," for purposes of all Virginia Subclass

Counts) incorporates by reference all paragraphs as though fully set forth herein.

320.    Plaintiff brings this Count on behalf of members of the Virginia Subclass.

321.    Honda is a "supplier" as defined by Va. Code Ann. § 59.1-198.

322.    The transaction between Plaintiff and the other Class members on the one

hand and Honda on the other, leading to the purchase or lease of the Affected Vehicles

by Plaintiff and other Class members, are "consumer transactions" as defined by Va.

Code Ann. § 59.1-1.98, because the Affected Vehicles were purchased or leased

primarily for personal, family or household purposes.

323.    The Virginia Consumer Protection Act ("Virginia CPA") prohibits the

following fraudulent acts or practices committed by a supplier with a consumer

transaction: "(5) misrepresenting that goods or services have certain quantities,

characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or

services are of a particular standard, quality, grade, style, or model; … (8) advertising

goods or services with intent not to sell them as advertised; … [and] (14) using any

other deception, fraud, false pretense, false promise, or misrepresentation in

connection with a consumer transaction[.]" Va. Code Ann. § 59.1-200(A).

324.    The facts concealed and omitted by Honda were material in that a

reasonable consumer would have considered them to be important in deciding whether

to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and

other Virginia Subclass members known of the Fuel Pump Defect, they would not

- 80 -

have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

325.   Honda's conduct proximately caused injuries to Plaintiff and the other Virginia Subclass members.

326.   Plaintiff and the other Virginia Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other Virginia Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Honda's misrepresentations, fraud, deceptive practices, and omissions.

327.   Honda's violations present a continuing risk to Plaintiff as well as to the general public. Honda's unlawful acts and practices complained of herein affect the public interest.

328.   Accordingly, Honda is liable to Plaintiff and the other Virginia Subclass members for damages in an amount to be proven at trial.

329.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiff and the Virginia Subclass members seek monetary relief against Honda measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for Plaintiffs and each Subclass member. Because Honda's conduct was committed willfully and knowingly, Plaintiff and the Virginia Subclass is entitled to recover, for him/herself and each Class member, the greater of (a) three times actual damages or (b) $1,000.

330.   Plaintiff also seek an order enjoining Honda's fraudulent, unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the Virginia General Business Law § 59.1-203 *et seq*.

## COUNT XV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (VA. CODE ANN. § 8.2-314)

331.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

332.   Plaintiff brings this Count on behalf of himself and the other Virginia Subclass members.

333.   Honda is a merchant with respect to motor vehicles under Va. Code Ann. § 8.2-314.

334.   Under Va. Code Ann. § 8.2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and other Virginia Subclass members purchased or leased their Affected Vehicles from Honda.

335.   The Affected Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

336.   Honda marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Virginia Subclass members' decisions to purchase the Affected Vehicles.

337.   Plaintiff and other Virginia Subclass members purchased the Affected Vehicles from Honda, or through Honda's authorized agents for retail sales. At all relevant times, Honda was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

338.   Honda knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

- 82 -

339.   Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

340.   Honda knew about the defect in the Affected Vehicles, allowing Honda to cure their breach of warranty if it chose to do so.

341.   Honda's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Honda's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Virginia Subclass members. Among other things, Plaintiff and other Virginia Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Virginia Subclass members, and Honda knew of the defect at the time of sale.

342.   Plaintiff and Virginia Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Honda's conduct described herein. Affording Honda a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

343.   Honda was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

344.   Accordingly, Honda is liable to Plaintiff and Virginia Subclass members for damages in an amount to be proven at trial.

- 83 -

### G.    Claims Brought on Behalf of a Pennsylvania Subclass

**COUNT XVI**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(73 P.S. § 201-1 *ET SEQ.*)**

345.    Plaintiff Elizabeth Lawrence Staples ("Plaintiff," for purposes of all Pennsylvania Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

346.    Plaintiff brings this Count on behalf of herself and the members of the Pennsylvania Subclass members.

347.    Plaintiff and other Pennsylvania Subclass members purchased the Class Vehicle primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

348.    All of the acts complained of herein were perpetrated by Honda in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

349.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods and services have … characteristics, … [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to see them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Honda engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

350.    The facts concealed and omitted by Honda were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other Pennsylvania Subclass members known of the Fuel Pump Defect, they would

- 84 -

not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

351.   Honda's conduct proximately caused injuries to Plaintiff and the other Pennsylvania Subclass members.

352.   Plaintiff and the other Pennsylvania Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other Pennsylvania Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Honda's misrepresentations, fraud, deceptive practices, and omissions.

353.   Honda's violations present a continuing risk to Plaintiff as well as to the general public. Honda's unlawful acts and practices complained of herein affect the public interest.

354.   Accordingly, Honda is liable to Plaintiff and the other Pennsylvania Subclass members for damages in an amount to be proven at trial.

355.   Honda is liable to Plaintiff and Pennsylvania Subclass members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff and other Pennsylvania Subclass members are also entitled to an award of punitive damages given that Honda's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT XVII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 PA. CONS. STAT. ANN. § 2314)

356.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

357.   Plaintiff brings this Count on behalf of herself and the members of the Pennsylvania Subclass members.

- 85 -

358.   Honda is a merchant with respect to motor vehicles under 13 Pa. Cons. Stat. Ann. § 2314.

359.   Under 13 Pa. Cons. Stat. Ann. § 2314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when purchased or leased their Affected Vehicles from Honda.

360.   The Affected Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

361.   Honda marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Pennsylvania Subclass members' decisions to purchase the Affected Vehicles.

362.   Plaintiff and Pennsylvania Subclass members purchased the Affected Vehicles from Honda, or through Honda's authorized agents for retail sales. At all relevant times, Honda was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

363.   Honda knew or had reason to know of the specific use for which the Affected Vehicles were purchased.

364.   Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

365.   Honda knew about the defect in the Affected Vehicles, allowing Honda to cure their breach of warranty if it chose to do so.

366.   Honda's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Honda's warranty limitations are unenforceable because they knowingly

- 86 -

sold a defective product without informing consumers about the defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Pennsylvania Subclass members. Among other things, Plaintiff and other Pennsylvania Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and Pennsylvania Subclass members, and Honda knew of the defect at the time of sale.

367.   Plaintiff and Pennsylvania Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Honda's conduct described herein. Affording Honda a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

368.   Honda was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

369.   Accordingly, Honda is liable to Plaintiff and Pennsylvania Subclass members for damages in an amount to be proven at trial.

## COUNT XVIII
## UNJUST ENRICHMENT

370.   Plaintiff incorporates all paragraphs as though fully set forth herein.

371.   Plaintiff brings this claim on behalf of herself and members of the Pennsylvania Subclass (collectively, "Plaintiffs").

372.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

373.   Honda has received and retained a benefit from Plaintiffs and inequity has resulted.

374.   Honda has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of Honda's conduct, at a profit, and Plaintiffs have overpaid for the Affected Vehicles and been forced to pay other costs.

- 87 -

375.   Thus, all Plaintiffs conferred a benefit on Honda.

376.   It is inequitable for Honda to retain these benefits.

377.   Plaintiffs were not aware of the true facts about the Affected Vehicles and did not benefit from Honda's conduct.

378.   Honda knowingly accepted the benefits of its unjust conduct.

379.   As a result of Honda's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**H.    Claims Brought on Behalf of a New York Subclass**

**COUNT XIX**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. GEN. BUS. LAW § 349)**

380.   Plaintiff Mohammed Karimzada ("Plaintiff," for purposes of all New York Class Counts) incorporates by reference all paragraphs as though fully set forth herein.

381.   Plaintiff brings this Count on behalf of himself and the members of the New York Subclass ("Plaintiffs").

382.   Plaintiffs are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

383.   Honda is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

384.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Honda's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of New York GBL. All of Honda's deceptive acts or practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing Affected Vehicles, was conduct directed at consumers and "consumer-oriented." Further, Plaintiffs suffered injury as a result of the deceptive act or practice.

385.   The facts concealed and omitted by Honda were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other New York Subclass members known of the Fuel Pump Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

386.   Honda's conduct proximately caused injuries to Plaintiff and the other New York Subclass members.

387.   Plaintiff and the other New York Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other New York Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Honda's misrepresentations, fraud, deceptive practices, and omissions.

388.   Honda's violations present a continuing risk to Plaintiff as well as to the general public. Honda's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Honda's deceptive practices exceed a million nationwide; (2) Honda has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Affected Vehicles as compared to Plaintiffs; and (3) so long as the Affected Vehicles continued to be sold and distributed, the likelihood of continued impact on other consumers is significant.

389.   Accordingly, Honda is liable to Plaintiff and the other New York Subclass members for damages in an amount to be proven at trial.

390.   Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the New York Subclass seek actual damages or $50, whichever is greater, in addition to discretionary

- 89 -

three times actual damages up to $1,000 for Honda's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs also seek attorneys' fees, an order enjoining Honda's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT XX
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. GEN. BUS. LAW § 350)

391.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

392.   Plaintiff brings this Count on behalf of himself and members of the New York Subclass (collectively, "Plaintiffs").

393.   Honda was engaged in the "conduct of business, trade or commerce" within the meaning of the New York's General Business Law § 350.

394.   New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

395.   Honda caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Honda, to be untrue and misleading to consumers, including Plaintiffs.

396.   The facts misrepresented, concealed and omitted by Honda were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had Plaintiff and other New York Subclass members known of the Fuel Pump Defect, they would

not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

397.    Honda's conduct proximately caused injuries to Plaintiff and the other New York Subclass members.

398.    Plaintiff and the other New York Subclass members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Honda's conduct in that Plaintiff and the other New York Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Honda's misrepresentations, fraud, deceptive practices, and omissions.

399.    Plaintiffs and the Class are entitled to recover their actual damages or $500, whichever is greater. Because Honda acted willfully or knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000.

**COUNT XXI**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.Y. U.C.C. § 2-314)**

400.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

401.    Plaintiff brings this Count on behalf of himself and the members of the New York Subclass ("Plaintiffs").

402.    Honda is a merchant with respect to motor vehicles within the meaning under N.Y. U.C.C. § 2-314.

403.    Under N.Y. U.C.C. § 2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Affected Vehicles from Honda.

- 91 -

404.    The Affected Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

405.    Honda marketed the Affected Vehicles as safe, reliable, and high quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiffs' decisions to purchase the Affected Vehicles.

406.    Plaintiffs purchased the Affected Vehicles from Honda, or through Honda's authorized agents for retail sales. At all relevant times, Honda was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles.

407.    Honda knew or had reason to know of the specific use for which Affected Vehicles were purchased.

408.    Because of the Fuel Pump Defect, the Affected Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

409.    Honda knew about the defect in the Affected Vehicles, allowing Honda to cure their breach of warranty if it chose to do so.

410.    Honda's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Honda's warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiff and other New York Subclass members. Among other things, Plaintiff and other New York Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and New York Subclass members, and Honda knew of the defect at the time of sale.

- 92 -

411.    Plaintiff and New York Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Honda's conduct described herein. Affording Honda a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

412.    Honda was provided notice of these issues by numerous complaints filed against it, internal investigations, postings on websites, and other sources.

413.    Accordingly, Honda is liable to Plaintiff and New York Subclass members for damages in an amount to be proven at trial.

**COUNT XXII**
**UNJUST ENRICHMENT**

414.    Plaintiff incorporates all paragraphs as though fully set forth herein.

415.    Plaintiff brings this claim on behalf of himself and members of the New York Subclass (collectively, "Plaintiffs").

416.    This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

417.    Honda has received and retained a benefit from Plaintiffs and inequity has resulted.

418.    Honda has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of Honda's conduct, at a profit, and Plaintiffs have overpaid for the Affected Vehicles and been forced to pay other costs.

419.    Thus, all Plaintiffs conferred a benefit on Honda.

420.    It is inequitable for Honda to retain these benefits.

421.    Plaintiffs were not aware of the true facts about the Affected Vehicles and did not benefit from Honda's conduct.

422.    Honda knowingly accepted the benefits of its unjust conduct.

423.    As a result of Honda's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

- 93 -

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully request that the Court enter judgment in their favor and against Honda, as follows:

A.     Certification of the proposed Nationwide Class and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.     Restitution, including at the election of Class members, recovery of the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their Affected Vehicles;

C.     Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.     An order requiring Honda to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all claims so triable.

- 94 -

1    Dated: August 24, 2020

2                                        Respectfully submitted,

3                                        By: */s/ Steve W. Berman*
                                         Steve W. Berman (*pro hac vice*)
4                                        Thomas E. Loeser (SBN 202724)
                                         Jerrod C. Patterson (*pro hac vice*)
5                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1301 Second Avenue, Suite 2000
6                                        Seattle, WA 98101
                                         Telephone: (206) 623-7292
7                                        Facsimile: (206) 623-0594
                                         Email: steve@hbsslaw.com
8                                        Email: toml@hbsslaw.com
                                         Email: jerrodp@hbsslaw.com

9

10                                       Christopher R. Pitoun (SBN 290235)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
11                                       301 North Lake Avenue, Suite 203
                                         Pasadena, CA 91101
12                                       Telephone: (213) 330-7150
                                         Facsimile: (213) 330-7152
13                                       Email: christopherp@hbsslaw.com

14

15                                       Andrew Levetown (*pro hac vice*)
                                         IVEY & LEVETOWN
16                                       6411 Ivy Lane, Suite 304
                                         Greenbelt, MD 20770
17                                       Telephone: (703) 618-2264
                                         Email: asl@iveylev.com

18                                       *Attorneys for Plaintiffs and the Proposed Class*

19

20

21

22

23

24

25

26

27

28

- 95 -